**In re James Clinton GARLAND, Debtor.**

**United States Trustee and the Internal Revenue Service, Plaintiffs–Appellees,**

v.

**James Clinton Garland, Defendant– Appellant.**

BAP No. EO–08–040.
Bankruptcy No. 05–73573.
Adversary No. 06–08044.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Sept. 18, 2009.

Ron Wright of Wright, Stout & Wilburn, P.L.L.C., Muskogee, OK, for Defendant–Appellant.

Paul R. Thomas (David W. Newman, Boise, ID, with him on the brief) of the United States Department of Justice, Office of the United States Trustee, Tulsa, OK, for Plaintiff–Appellee United States Trustee.

Olivia R. Hussey, Tax Division, United States Department of Justice (Mary E. Bielefeld with her on the brief), Washington, D.C., for Plaintiff–Appellee Internal Revenue Service.

Before BROWN, THURMAN, and ROMERO, Bankruptcy Judges.

## OPINION

THURMAN, Bankruptcy Judge.

The debtor, James Clinton Garland ("Debtor"), appeals the Bankruptcy Court's order denying him a discharge pursuant to 11 U.S.C. § 727(a)(2), (a)(4)(A), and (a)(5).[1] We affirm.

## I. BACKGROUND

Debtor is a lawyer who is now mostly retired from legal practice, but who once represented plaintiffs in complex class-action litigation. He filed his petition for Chapter 7 bankruptcy relief on August 25, 2005.[2] In his Statement of Financial Affairs ("SOFA") and his schedules, Debtor represented that he had minimal personal property and income, no interest in real property, and owed over $1.7 million to creditors. Debtor also represented that he had neither been an officer or director of, nor had an ownership interest in, any businesses within the six years preceding his bankruptcy, and that the only property held by him for another consisted of two older vehicles he acknowledged were owned by Commercial Litigation Group ("CLG"), a legal partnership that he had founded in 1997. Based on this information, as well as the Debtor's verification of it at the first meeting of creditors, the Chapter 7 trustee ("Trustee") filed a report indicating there were no assets in the case for distribution to creditors.

In January 2006, the United States Trustee ("UST") filed a complaint in an adversary proceeding against the Debtor, seeking a denial of discharge on the basis that his bankruptcy filings contained several misstatements and/or omissions. Particularly at issue were: 1) Debtor's interest in a 90–acre property with a large house that he used as his residence (the "Property"); 2) Debtor's ownership and/or control of certain businesses; and 3) Debtor's signatory authority on several bank accounts. Debtor denied the allegations, and filed his own adversary proceeding against the IRS seeking discharge of its claims against him. The two adversary proceedings were consolidated by the Bankruptcy Court, and a trial was had on the issues. After trial, the Bankruptcy Court granted the relief requested by the UST, denying Debtor a discharge pursuant to all three Code provisions asserted in the complaint against him. Based on that ruling, the Bankruptcy Court declared the Debtor's complaint against the IRS to be moot.

---

1. Unless otherwise specified, all further statutory references will be to Title 11 of the United States Code.

2. Debtor's petition was filed prior to the effective date of the sweeping amendments to the Bankruptcy Code in October 2005. There-fore, all Code section citations herein are to the statutes as they were prior to that date. However, the Code sections upon which the Bankruptcy Court relied in denying Debtor's discharge were not altered by the 2005 amendments.

## II. APPELLATE JURISDICTION

■ Denial of discharge is a final order for purposes of appeal.[3] The bankruptcy court's opinion and judgment were entered on March 31, 2008, and Debtor timely filed his notice of appeal on April 9, 2008. No party elected to have this appeal heard by the district court and, therefore, this Court has appellate jurisdiction over this case.[4]

## III. ISSUES AND STANDARD OF REVIEW

■ "A decision whether to grant or deny a discharge is in the sound discretion of the bankruptcy court," and a bankruptcy court's denial of discharge is therefore reviewed for abuse of discretion.[5] However, Debtor's principal claim in this appeal is that the evidence is insufficient to support the Bankruptcy Court's ruling. A bankruptcy court's fact findings may not be reversed unless they are clearly erroneous.[6] Debtor also asserts that the Bankruptcy Court should have applied the doctrines of res judicata, collateral estoppel, and/or Rooker–Feldman to the IRS's claims of impropriety of the Property transfers. This is a legal issue that is reviewed *de novo*.[7] This decision will address all three standards.

## IV. DISCUSSION

■ The UST relied on three statutory provisions in asserting its complaint against Debtor, which are as follows:

(a) The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition [hereinafter, "Transfer Exception"];

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account [hereinafter, "False Oath Exception"]; [or]

. . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities [hereinafter, "Dissipation Exception."] [8]

A plaintiff asserting an exception to discharge under § 727 must prove the elements of the exception by a preponderance of the evidence.[9] However, the plaintiff "need prove only one of the grounds for

3. *See Law Office of Larry A. Henning v. Mellor (In re Mellor)*, 226 B.R. 451, 453 (D.Colo. 1998).

4. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002.

5. 4 *Norton Bankr.L. & Prac.3d* § 86:1 (2009).

6. *Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982). *See also, In re BYOC Int'l Inc.*, 233 B.R. 176, 1998 WL 780435, at \*2 (10th Cir. BAP 1998) (sufficiency of the evidence is reviewed under a clearly erroneous standard, and trial court's decision need not be "correct," only "permissible").

7. *State Bank of S. Utah v. Gledhill (In re Gledhill)*, 76 F.3d 1070, 1082 (10th Cir.1996).

8. § 727(a)(2)(A), (a)(4)(A), and (a)(5).

9. Fed. R. Bankr.P. 4005.

non-dischargeability under § 727(a) because the provisions of § 727(a) are phrased in the disjunctive."[10] Thus, proof that satisfies any one subsection is sufficient to justify denial of a debtor's request for a discharge.[11] Nonetheless, the Bankruptcy Court found that Debtor had violated all three of the subsections upon which the UST had relied.

This highly fact-intensive appeal focuses primarily on the sufficiency of the evidence in support of the Bankruptcy Court's findings. As a result, this Court's role has largely been to review the record provided to us by the Debtor, in order to determine whether or not the Bankruptcy Court's resolution of factual issues can be considered clearly erroneous. A factual finding is "clearly erroneous" when "it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made."[12] Although we discuss herein only those facts that are necessary to this decision, a full recitation of the facts and the factual issues may be found in the Bankruptcy Court's published decision.[13]

### A. Debtor's Residence

The Property, which has been Debtor's full-time residence since at least 1995,[14] consists of 90 acres of land in rural Oklahoma, on which are a 5,362 square foot house, a pool, two barns, a greenhouse, and a tennis court. In the early 1980s, title to the Property was held by Blackland Music Co., Inc. ("Blackland"), a corporation that was jointly owned by Debtor and Karon Blackwell. In 1983, as managing partner of Blackland, Debtor deeded the Property to himself, individually. However, that deed was not recorded until 1987, when Debtor and Karon Blackwell settled a legal dispute and she released her interest in the Property. Debtor also assumed the outstanding mortgage on the Property, which had been in place since 1978. In 1988, Debtor obtained a loan from the Radiology Profit Sharing Plan ("Radiology"), which he secured with a second mortgage on the Property. Radiology was a retirement plan owned by four practicing medical doctors who were clients of Patrick Walters ("Walters"), a certified public accountant and a close friend and business associate of the Debtor. Walters was the trustee of the retirement plan. Though Debtor was required by the terms of the loan to make monthly payments of $1,105 for a period of sixty months, he made no payments for approximately twelve years.

In July 1993, Debtor created a limited partnership called the Jagar Family Trust ("Jagar"). Jagar's general partner was Southwest Industrial and Investment Enterprises, Inc. ("Southwest"), which was

---

**10.** *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 250 (4th Cir.1994). *See also First Union Nat'l Bank v. Golob (In re Golob),* 252 B.R. 69, 75 (Bankr.E.D.Va.2000); *Consumers United Capital Corp. v. Greene (In re Greene),* 202 B.R. 68, 73 (Bankr.D.Md.1996).

**11.** *Id.*

**12.** *Las Vegas Ice & Cold Storage Co. v. Far W. Bank,* 893 F.2d 1182, 1185 (10th Cir.1990) (internal quotation marks omitted).

**13.** *See Garland v. United States (In re Garland),* 385 B.R. 280 (Bankr.E.D.Okla.2008).

**14.** The stipulated facts submitted by the parties prior to trial state that Debtor "continuously resided" on the Property since 1981, and the Bankruptcy Court so found in its decision. However, Debtor testified at trial that he did not reside fulltime on the Property until 1995. Regardless which date is more accurate, it is evident from the record that Debtor, alone, controlled the Property, and at least sometimes lived there for many years prior to the filing of his petition, including the times when its title was held by others.

wholly owned by Walters, though Debtor signed the partnership agreement on Southwest's behalf, as its President. The Jagar limited partners were Debtor, his adult sons William, James, and Douglas Garland, and Gerie Blackwell, the mother of Debtor's two minor children. Jagar had no assets until Debtor deeded the Property to it, "in exchange for" his partnership interest.[15] The deed from Debtor to Jagar, dated January 3, 1994, was not recorded until December 29, 1994.

In 2000, when the plan owners were nearing retirement, Walters asked the Debtor to pay off the Radiology loan. Debtor's failure to do so ultimately led to the breakdown of his friendship with Walters. However, in December 2000, Debtor incorporated A–Don Corporation ("A–Don"), naming Walters as its sole shareholder and president, and himself as its registered agent. The primary reason for creation of A–Don was for it to purchase and foreclose the outstanding mortgages on the Property. A–Don in fact acquired both mortgages and, in 2001, filed a foreclosure action in state court on the mortgage it had obtained from Radiology.

On October 3, 2001, a judgment of foreclosure was entered, granting A–Don judgment against the Property in the amount of approximately $250,000 and declaring IRS liens filed against the Debtor and the Property to be inferior to A–Don's. A–Don subsequently acquired the Property by credit bid at the foreclosure sale in December 2001, which the state court approved in February 2002.[16] As a result, the IRS liens on the Property were extinguished. Shortly thereafter, in March 2002, Walters "sold" all A–Don's stock to Clark Bundren ("Bundren"), another friend and business associate of the Debtor, for $100, stating that he "was all done" with Debtor. In September 2002, A–Don leased the Property to CLG, which was then owned by Debtor's sons, William and James Garland, both of whom are also lawyers. The Property lease was for a period of three years for $1,500 per month. A–Don also sold to CLG, for $10, an assignable option allowing purchase of the Property for $175,000. In January 2005, Debtor's son Douglas, at the urging of his brothers, exercised CLG's option and purchased the Property from A–Don with a mortgage loan from Chase Bank.[17] Both before and after the purchase by Douglas Garland, the mortgage and other expenses associated with the Property were paid on a monthly basis by CLG, usually with checks bearing Debtor's signature.

## B. Debtor's Business Interests

Most, if not all, of Debtor's income during the relevant time period was earned by him through his law practice, which was

---

15. When Jagar was formed, the ownership interests were listed as follows: Southwest 10%, Debtor 66%, and the remaining four partners 6% each. It does not appear that any of the partners besides Debtor "paid" for their interest in the partnership.

16. The Property was actually foreclosed in two proceedings because the legal description in the first action inadvertently omitted 20 acres of real property. The second foreclosure action, filed in September 2002, resulted in another foreclosure judgment and another purchase of the Property at a sheriff's sale by A–Don.

17. Douglas had not been looking for an investment opportunity and could not afford to purchase the Property without help. Therefore, CLG paid all of the expenses associated with obtaining the mortgage, and continued to pay the Property expenses after Douglas's purchase. Significantly, William and James Garland, also gave Douglas signatory authority on CLG's bank account, signing his name without his knowledge, so that he could qualify for the Property loan. Douglas never lived on the Property, had no belongings there, did not have a key to the residence, and never charged his father any rent.

set up as a professional corporation, James Clinton Garland, P.C. Beginning in 1997, Debtor's professional corporation was a partner in CLG, which at some point in time prior to Debtor's bankruptcy consisted of the three professional corporations of Debtor and his sons, William and James. Though we do not have documentation of it in the record, Debtor claims that he withdrew from the CLG partnership in January 2002, but he continued to do occasional work for the partnership in an "of counsel" capacity, continued to have signatory authority on its bank accounts, and continued to regularly write checks on at least one of its accounts. Debtor testified at trial that he never wrote checks on CLG's accounts after his resignation unless he was directed to do so by either William or James Garland.

Debtor retained the largest percentage interest in Jagar until at least October 1999, when the IRS filed its first Notice of Federal Tax Lien ("NFTL") against that entity. That lien led Walters, acting as chairman of Southwest, to issue a letter in November 1999, informing Debtor that his interest in Jagar was automatically terminated by the lien filing under the terms of the partnership agreement, and that Debtor would thereafter be required to pay $1,500 per month for continued occupancy of the Property.[18]

### C. Debtor's Tax Situation

The Debtor's income as a class-action lawyer was inconsistent, based on the nature of such actions, which typically take a long time to conclude, during which no income is received, but at the end of which very large attorney's fees may be awarded. Although Debtor testified that he used the income received in the good years to pay the debts he incurred in the lean ones, he apparently did not anticipate his tax liability very well. Thus, the tax liability on income earned in a "good" year would not become due until the following year, by which time, Debtor apparently no longer had the funds to pay it. For example, Debtor filed his return for tax year 1992 in October 1993, without paying the taxes owed. In November 1993, the IRS assessed Debtor's 1992 tax liability. Debtor filed his 1993 tax return in October 1994, also without paying the taxes, and the IRS assessed his 1993 tax liability in November 1994.

In March 1995, the IRS issued an NFTL against Debtor for his unpaid 1992 and 1993 taxes. In October 1999, the IRS issued an NFTL against Jagar, as the Debtor's "nominee." [19] By the time Debtor's bankruptcy petition was filed, the IRS had issued tax liens against Debtor and/or Jagar for tax years 1992, 1993, 1995, 1998, 1999, and 2000.[20]

### D. Debtor's Bankruptcy Filings

Schedule A in Debtor's filings directs debtors to "list all real property in which the debtor has any legal, equitable, or future interest." In response, Debtor stated "None." In Schedule B, in response to

---

**18.** Prior to this notice, the Debtor had not paid Jagar anything for his occupancy of the Property, despite having controlled and resided in it during the entire period of Jagar's ownership. Afterwards, the $1,500 per month was paid by CLG.

**19.** A nominee tax lien is filed against a third party that holds title to property the IRS contends is beneficially owned by the taxpay-

er. Debtor contested the nominee lien before the IRS. However, before that matter was finally resolved, the IRS liens on the Property were eliminated by the foreclosure of a superior lien, rendering the issue moot.

**20.** In the schedules filed with his bankruptcy petition, Debtor listed his liability to the IRS as in excess of $1.1 million.

the directive to list all of his personal property, and specifically, his "[c]hecking, savings or other financial accounts," Debtor listed only one checking account at Armstrong Bank, in the amount of $500. Likewise, with respect to his "[s]tock and interests in incorporated and unincorporated businesses," Debtor only listed the stock in his professional corporation, claiming that it was without any value. As to "[i]nterests in partnerships or joint ventures," Debtor marked "none."

In his SOFA, in response to the direction in section 14 to "[l]ist all property owned by another person that the debtor holds or controls," Debtor identified two vehicles, a 1982 Mercedes Diesel and a 1993 GMC Suburban, stating that they were both owned by CLG. He listed no other property in this category. In section 18, Debtor marked "none" in response to the direction to list "all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional" or in which he "owned 5 percent or more of the voting or equity securities" within the six years preceding the filing of his petition.

### E. The False Oath Exception (§ 727(a)(4)(A))

 "In order to deny a debtor's discharge pursuant to this provision, a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact."[21] A "false oath" may be either: "(1) a false statement or omission in the debtor's schedules or (2) a false statement by the

debtor at an examination during the course of the proceedings."[22]

### 1. False Oath

In this case, the alleged fraud consists of omissions rather than statements. Thus, the UST asserted that in several places in the Debtor's submitted filings he failed to disclose assets, potential assets, and/or withheld information that could have led to the discovery of assets. The omissions relate to the Debtor's role in various business entities, his signatory authority and/or ownership of a number of bank accounts, and his interest in the Property.

Debtor does not dispute that he failed to disclose some businesses in which he had an ownership interest or governing authority within six years of his bankruptcy filing, but asserts that such non-disclosures were neither material nor fraudulently made. With respect to both the Property and the checking accounts, Debtor contends that his responses were not "false."

### 2. Materiality

 "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[23] Moreover, materiality is not defeated by the fact that the undisclosed property interests are determined to be without value.[24] This is because "[b]ankruptcy is a serious matter and when one chooses to avail himself of the benefits of Chapter 7 relief he assumes certain responsibilities, the foremost being

---

**21.** *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir.1997).

**22.** 6–27 *Collier on Bankruptcy* ¶ 727.04[1][c] (15th ed. rev.2009) (footnote omitted).

**23.** *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984). *See also In re Calder*, 907 F.2d 953, 955 (10th Cir.1990).

**24.** *In re Calder*, 907 F.2d at 955.

to fully disclose his assets and to cooperate fully with the trustee."[25] As such, debtors have an "uncompromising duty to disclose whatever ownership interest [they hold] in property,"[26] and they must "disclose everything," rather than "make decisions about what they deem important enough for parties in interest to know."[27]

### 3. Fraudulent Intent

The problem in ascertaining whether a debtor acted with fraudulent intent is difficult because, ordinarily, the debtor will be the only person able to testify directly concerning his intent and he is unlikely to state that his intent was fraudulent. Therefore, fraudulent intent may be deduced from the facts and circumstances of a case.[28]

While "mere mistake or inadvertence is not sufficient to bar a debtor's discharge" under § 727, "reckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)."[29] Certain "badges of fraud" have been identified as suggestive of the existence of fraudulent intent, including:

(1) concealment of prebankruptcy conversions; (2) conversion of assets immediately before the filing of the bankruptcy petition; (3) gratuitous transfers of property; (4) continued use by the debtor of transferred property; (5) transfers to family members; (6) obtaining credit to purchase exempt property; (7) conversion of property after entry of a large judgment against the debtor; (8) a pattern of sharp dealing by the debtor prior to bankruptcy; (9) insolvency of the debtor resulting from the conversion of the assets; and (10) the monetary value of the assets converted.[30]

In addition, fraud may sometimes be inferred from a deterioration of the debtor's financial condition after a questioned transaction, or by the existence of a pattern or series of transactions that apparently relate to pressure from creditors.[31]

### 4. The Evidence

We cannot overemphasize the importance to the bankruptcy system of full and honest disclosure of information by the parties seeking its protections. A Chapter 7 proceeding is not, nor should be, an arena in which players engage in obfuscation of facts in order to obtain an outcome not sanctioned by the Bankruptcy Code. Instead, a bankruptcy liquidation should be conducted as a joint effort to obtain both a fresh start for the debtor and the best possible return for its creditors, all within an environment of relative calm, overseen by the dispassionate but watchful eyes of a Chapter 7 trustee and ultimately ruled on by a bankruptcy judge. Competitive gamesmanship is inappropriate to the bankruptcy system. Thus, bankruptcy statutes and bankruptcy judges seek to prevent any party's taking of undue advantage over another while they are within the confines of the system. Typically, the

---

**25.** *Morrel, West & Saffa, Inc. v. Riley (In re Riley),* 128 B.R. 567, 570 (Bankr.N.D.Okla. 1991).

**26.** *Id.*

**27.** *Freelife Int'l, LLC v. Butler (In re Butler),* 377 B.R. 895, 923 (Bankr.D.Utah 2006).

**28.** *In re Calder,* 907 F.2d at 955–56 (citation omitted).

**29.** *Cadle Co. v. King (In re King),* 272 B.R. 281, 302 (Bankr.N.D.Okla.2002) (internal quotation marks omitted).

**30.** *Quicken Loans, Inc. v. Splawn (In re Splawn),* 376 B.R. 747, 755 (Bankr.D.N.M. 2007).

**31.** *Id.*

protections provided by Chapter 7 are sought by "honest but unfortunate debtors" who do their best to fully disclose their financial condition. Occasionally, however, a debtor comes before the bankruptcy courts seeking something other than a "fresh start," such as elimination of creditor claims without the corresponding full disclosure of assets. This is precisely such a case.

■ In response to the UST's claims against him, Debtor asserted that he was not required to list the Property in his bankruptcy filings because he had no ownership interest in it. However, in analogous cases, bankruptcy courts have determined that, despite an unqualified transfer of legal title, debtors who retain beneficial use of the property and treat it as their own continue to hold a beneficial interest that must be disclosed.[32] In *Olivier*, debtors transferred legal ownership of their residence to a family member shortly after their minor son was involved in a car accident that was expected to, and did, result in debtors' liability. The debtors continued to reside in the residence, rent-free, and almost immediately returned the "purchaser's" payment. The court held that the debtors' "motivation, their continuing occupancy of the house rent-free, their prompt return of all the 'purchase money,' and their acts of ownership such as insuring and maintaining the property taken together amply support the conclusion that notwithstanding the purportedly complete transfer they retained a significant beneficial interest in the property."[33]

Similarly, in *Hayes*, the debtors transferred their residence for no consideration to their son, purportedly as the trustee of a trust for the benefit of their children, while they were facing significant liability based on their personal guaranties of a failed partnership project. After conveyance of their residence, the debtors "continued to live there, treating the property and its equity as their own in every respect by paying all expenses and pledging it as collateral" to pay their attorney's fees.[34] Accordingly, both the bankruptcy court and the First Circuit BAP determined that the debtors had "continued to retain an interest" in their residence.[35] In each of the foregoing cases, the Debtors' discharge was denied.

■ In the present case, Debtor did not list the Property, his residence for many years, anywhere in his bankruptcy filings. He transferred the Property for no consideration at a time when he knew he was facing a significant tax debt. Though Debtor claimed that his initial transfer of the Property to Jagar was for the purpose of estate planning, he included only three of his seven children in the family trust. Debtor had continuous and exclusive use of the Property, provided improvements and maintenance on the Property, and paid the Property's expenses, both before and after he allegedly relinquished his ownership of it. Each and

---

32. *See Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550 (5th Cir.1987) and *R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253 (1st Cir. BAP 1999). Both of these cases found that the debtors' transfer of property more than one year prior to their bankruptcy filing still fell within the Transfer Exception to discharge (§ 727(a)(2)(A)) pursuant to the doctrine of "continuing concealment." The reasoning in those cases is also applicable to the False Oath Exception, since

"intentional and fraudulent omission of assets from the [SOFA] or schedules can constitute both a concealment and a false oath." *Farmers Co–Operative Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982).

33. *In re Olivier*, 819 F.2d at 554.

34. *In re Hayes*, 229 B.R. at 257.

35. *Id.*

every transfer of the Property involved Debtor's friends or family and, in addition, Debtor was actively involved in the formation of the corporation whose sole purpose was to foreclose on the Property and thereby eliminate the IRS's tax liens. Despite these facts, Debtor did not even list the Property as property "held" by him for another on his SOFA or his schedules, as he did the two vehicles that were titled to CLG. Debtor's claim that he lived on the Property at the whim of his sons, was rejected by the Bankruptcy Court, stating:

> [W]hether there was an express agreement or not, it was clear from [Douglas Garland's] testimony and the testimony of his brother, Bill, and his father, that Douglas purchased the [Property] from A–Don for the sole purpose of preserving the [Property] for [Debtor] and his family, and, thus, keeping it away from creditors. Therefore, it is highly unlikely that Douglas or his brothers would ever give up [the Property] and force their father and his family to move out.[36]

Moreover, the Debtor is an intelligent, sophisticated attorney. He has been lead counsel in complex litigation, and estimated that he personally had formed approximately 600 corporations. He understood the function of a Chapter 7 bankruptcy proceeding, as well as the need for full and honest disclosure. Nonetheless, Debtor did not list his recent ownership or directorship of a number of businesses, and did not reveal his signatory authority on five bank accounts at the same bank as the one account he did list. At least some of those unrevealed accounts contained significant amounts of money, and were used by Debtor to pay his and his family's living expenses. Indeed, Debtor remained a sig-

natory on the Jagar account even after his partnership interest was supposedly terminated, and his wholly-owned company, Savol Enterprises, ultimately obtained Southwest's general partnership interest in Jagar. For some period of time, CLG used Jagar's bank account as its own, running the law firm's income and expenses through that account rather than its own. During that time, Debtor signed checks on Jagar's account to pay his own living expenses.

Debtor claimed that the omission of some of these items was an oversight, and continues to assert that his signatory authority on the accounts was a convenience to his sons, rather than indicative of his ownership of account funds. However, Debtor is not "an unsophisticated debtor with little or no knowledge of business or commerce," and it is difficult to believe that the omissions in his filings were the result of mistake or honest error.[37] In any event, this Court may only reverse a bankruptcy court's fact findings if they are clearly erroneous, and "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."[38] In that respect, the Bankruptcy Court stated:

> This Court had ample opportunity to observe Garland over the course of the two day trial, and assess his demeanor and credibility while he explained the reasons for the omissions from his schedules, while admitting that he signed his bankruptcy papers under penalty of perjury. The Court is convinced that these omissions were not the result of any confusion, ignorance, mistake, or carelessness. Instead, the

---

**36.** *In re Garland,* 385 B.R. at 298.

**37.** *In re King,* 272 B.R. at 303. *See also In re Calder,* 907 F.2d at 956 (fraudulent intent inferred from facts that debtor was an experi-enced bankruptcy attorney who had not one, but four, separate omissions in his filings).

**38.** Fed. R. Bankr.P. 8013.

Court finds that the omissions were a result of a deliberate decision to withhold the information from this Court, the Bankruptcy Trustee, and Garland's creditors.

. . . .

Garland's testimony that he omitted his ownership interests by mistake is not believable. At the very least, these omissions by an experienced attorney establish a reckless indifference to the truth and the legal process.[39]

We cannot conclude that the Bankruptcy Court's findings in this matter are clearly erroneous. We therefore affirm its findings that the Debtor's omissions in his bankruptcy filings were material false oaths made with intent to defraud, which are within the purview of § 727(a)(4)(A). In addition, we conclude that the Bankruptcy Court's denial of discharge on the basis of the facts before it was not an abuse of discretion. Because proof of any one of the § 727 exceptions is a sufficient basis upon which to deny discharge, we do not need to consider whether Debtor's conduct also falls within the Transfer and Dissipation Exceptions, as found by the Bankruptcy Court.

### F. Debtor's Preclusion Defenses

As defenses to the UST's complaint, Debtor asserted that the claims therein were barred by certain legal preclusion doctrines and, accordingly, these defenses and rulings thereon shall be considered on appeal, *de novo*. These defenses were all based on a prior state court foreclosure proceeding in which the issue of fraudulent transfer was raised. Thus, A–Don's foreclosure of the Property was actually accomplished in two separate actions because

of a property description error in the first proceeding.[40] In the first action, the IRS's response to the complaint was simply a request that their lien priority be determined. In the first foreclosure judgment, the state court determined that the IRS liens were inferior to the ones obtained by A–Don. The second action, which was filed in September 2002, was removed to federal district court by the IRS. In its answer to the complaint, the IRS asserted that the A–Don transactions were shams in that plaintiff A–Don Corporation is an instrumentality of the taxpayer, James Clinton Garland, being used to avoid his federal tax liability. Pursuant to a settlement agreement, A–Don paid the IRS $8,000 to withdraw its claims and agreed to have the matter remanded to the state court. After the state court entered the second foreclosure judgment, A–Don purchased the remaining 20 acres of the Property at a sheriff's sale.[41]

Based on these occurrences, Debtor asserts that the IRS should be precluded from asserting fraud in this proceeding by the doctrines of res judicata, collateral estoppel, and/or Rooker–Feldman. The Debtor's position on this issue is without merit and, therefore, we will only briefly discuss these doctrines within the context of this proceeding.

#### 1. Issue/Claim Preclusion

■ "Res judicata [or 'claim preclusion'] requires the satisfaction of four elements: (1) the prior suit must have ended with a judgment on the merits; (2) the parties must be identical or in privity; (3) the suit must be based on the same cause of action; and (4) the party must have had a full and fair opportunity to litigate the claim in the prior suit."[42]

---

**39.** *In re Garland,* 385 B.R. at 299–300.

**40.** *See* n. 16, *supra.*

**41.** *In re Garland,* 385 B.R. at 287.

**42.** *In re Mersmann,* 505 F.3d 1033, 1049 (10th Cir.2007).

Similarly, collateral estoppel (or "issue preclusion") may also be invoked to prevent re-litigation of factual issues that have already been determined in a prior judgment, but it is an equitable doctrine that is applied at the court's discretion.[43] In considering the preclusive effect of a state court judgment, a federal court is required to give it the same preclusive effect as the state court would.[44] We therefore look to Oklahoma state law to determine the preclusive effect of its judgments. The Oklahoma Supreme Court has stated the rule as follows:

> In accordance with the doctrine of issue preclusion (previously known as collateral estoppel), once a court has decided an issue of fact or law necessary to its judgment, the same parties or their privies may not relitigate that issue in a suit brought upon a different claim. The principle of issue preclusion operates to bar from relitigation both correct and erroneous resolutions of jurisdictional and nonjurisdictional challenges. An issue is actually litigated and necessarily determined if it is properly raised in the pleadings, or otherwise submitted for determination, and judgment would not have been rendered but for the determination of that issue. The doctrine may not be invoked if the party against whom the earlier decision is interposed did not have a "full and fair opportunity" to litigate the critical issue in the previous case.[45]

There are a number of reasons why these preclusion doctrines are not applicable to the IRS's current claims. To begin with, the issue of Debtor's entitlement to discharge under various provisions of the Bankruptcy Code is not an issue that would have arisen in, or been determined by, a state court in a foreclosure action.[46] In addition, even if the claim that Debtor's transfers of the Property constituted a fraud on his creditors was necessarily resolved against the IRS in the foreclosure action, that is not the claim that the IRS is pursuing in this case. Instead, the issue before the Bankruptcy Court was whether Debtor fraudulently failed to disclose information in his bankruptcy filings that he was required to disclose pursuant to bankruptcy law. Thus, the preclusion doctrines do not bar the IRS's current claims.

## 2. Rooker–Feldman Doctrine

The Rooker–Feldman doctrine protects the integrity of state court judgments from collateral attack in the federal courts.[47] The doctrine only applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."[48] In this case, the IRS is not seeking to "end-run" the foreclosure judgments in federal court. Rather, the IRS has simply asserted a claim in a bankruptcy case alleging that a debtor should not be granted a discharge due to fraudulent conduct in connection with the bankruptcy.

**43.** *Elletson v. Riggle (In re Riggle)*, 389 B.R. 167, 173 (D.Colo.2007).

**44.** *Id.*

**45.** *Okla. Dep't of Pub. Safety v. McCrady*, 176 P.3d 1194, 1199 (Okla.2007) (footnotes omitted).

**46.** Objections to a debtor's discharge are "core" bankruptcy proceedings. 28 U.S.C. § 157(b)(2)(J).

**47.** *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283–84, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005).

**48.** *Id.* at 284, 125 S.Ct. 1517.

The Rooker–Feldman doctrine does not preclude it from doing so.

## V. CONCLUSION

Based on the foregoing, the Bankruptcy Court's judgment denying Debtor a Chapter 7 discharge is AFFIRMED.