FILED
U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

March 9, 2015

Blaine F. Bates
Clerk

PUBLISH

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

| | |
|---|---|
| IN RE GEORGE DAVID GORDON, JR., <br><br> Debtor. | BAP No.    NO-14-018 |
| RICHARD A. WIELAND, United States Trustee, <br><br> Plaintiff – Appellee, <br><br> v. <br><br> GEORGE DAVID GORDON, JR., <br><br> Defendant – Appellant. | Bankr. No.  11-10045 <br> Adv. No.    11-01113 <br>   Chapter   7 <br><br><br> OPINION |

Appeal from the United States Bankruptcy Court
for the Northern District of Oklahoma

Submitted on the briefs:[*]

Ron D. Brown of Brown Law Firm PC, Tulsa, Oklahoma, for Defendant – Appellant.

Ramona D. Elliott, Deputy Director/General Counsel (P. Matthew Sutko, Associate General Counsel, and Cameron M. Gulden, Trial Attorney, with her on the brief) Washington, D.C., and Samuel K. Crocker, United States Trustee for Region 20 (Katherine Vance, Assistant United States Trustee, and Paul R. Thomas, Trial Attorney, with him on the brief), Tulsa, Oklahoma for Plaintiff – Appellee.

Before NUGENT, KARLIN, and SOMERS, Bankruptcy Judges.

---

[*]     The parties did not request oral argument, and after examining the briefs and appellate record, the Court has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. Bankr. P. 8019(b)(3). The case is therefore ordered submitted without oral argument.

SOMERS, Bankruptcy Judge.

Debtor George David Gordon, Jr. ("Gordon") was formerly a practicing securities attorney and a certified public accountant, who regularly engaged in securities investing on behalf of himself, his wife, and his clients. He conducted business through his solely-owned professional corporation, G. David Gordon & Associates, P.C. (the "Professional Corporation" or the "PC"), which he had incorporated for the purpose of providing legal services. In approximately 2004, Gordon began conspiring with others in a sophisticated scheme to buy inexpensive stocks, artificially inflate their value, and then sell them to others at a substantial profit. This "pump-and-dump"[1] conspiracy resulted in the filing of numerous federal criminal charges against Gordon. In turn, the criminal proceedings resulted in Gordon's May 2010 securities fraud conviction and his immediate and continuing imprisonment. The criminal court also imposed fines and restitution, and ordered the forfeiture of much of Gordon's property.

Seven months after his conviction and imprisonment, Gordon initiated this Chapter 7 bankruptcy case, seeking to discharge any and all of his debts that could be discharged under federal bankruptcy law. The bankruptcy court, after a trial, denied Gordon a discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A),[2] based on findings that Gordon had transferred and concealed property for the purpose of defrauding his creditors, had knowingly and fraudulently made false statements in his bankruptcy filings, and had withheld information regarding his assets and business dealings from the bankruptcy trustee. Gordon appealed

---

[1] A pump-and-dump scheme treats the investing adage, "Buy low, sell high," as a mechanism for deceit. The scheme involves "the inflation of stock prices on the basis of false or fraudulent information (the 'pump'), followed by the sale of that stock to unsuspecting investors (the 'dump')." *See* Bankruptcy Court Memorandum Decision, p.3 n. 4 *in* Appellant's Appendix ("Appx") at 955.

[2] Unless otherwise indicated, all further statutory references in this decision will be to the Bankruptcy Code, which is Title 11 of the United States Code.

that ruling to this Court.[3]

## I.    APPELLATE JURISDICTION

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[4]  An order denying a debtor's discharge in bankruptcy is a final order for purposes of appeal.[5]  The bankruptcy court's decision denying Gordon's discharge was entered on March 31, 2014, and Gordon timely filed his notice of appeal on April 13, 2014.[6]  Since neither party elected to have this appeal heard by the district court, this Court is vested with appellate jurisdiction.

## II.   ISSUES AND STANDARDS OF REVIEW

Gordon raises three issues[7] in this appeal:

1.    **Must a plaintiff asserting continuing fraudulent concealment under § 727(a)(2)(A) prove that creditors were damaged as a result of the debtor's conduct?**

This is a legal issue that is reviewed on appeal *de novo*.[8]  *De novo* review

---

[3]    At all times relevant to this appeal, Gordon was married to Amy Gordon ("Mrs. Gordon").  The Gordons cohabited in the family residence until May 2010, when Gordon was incarcerated.  In November 2012, Mrs. Gordon requested relief from stay in Gordon's bankruptcy case in order to proceed with a divorce.  That request was granted by the bankruptcy court on December 18, 2012.  Nonetheless, Gordon testified in September 2013 that he and Mrs. Gordon remained married.

[4]    28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8002, 8005; 10th Cir. BAP L.R. 8005-1.

[5]    *United States Trustee v. Garland (In re Garland)*, 417 B.R. 805, 810 (10th Cir. BAP 2009).

[6]    Pursuant to Federal Rule of Bankruptcy Procedure 8002(a), a party seeking to appeal an order must file a notice of appeal from that order within fourteen days of its entry on the docket.  FED. R. BANKR. P. 8002(a).

[7]    A fourth issue, asserting that plaintiff's § 727(a)(3) and (5) claims were not considered by the bankruptcy court and are therefore not subject to appellate review, is uncontested and need not be addressed in this decision.

[8]    *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 685 (10th Cir. BAP

(continued...)

-3-

requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision.[9]

>    2.   **Was the evidence presented at trial by the plaintiff sufficient to support the bankruptcy court's denial of discharge under § 727(a)(2)?**

"A decision whether to grant or deny a discharge is in the sound discretion of the bankruptcy court, and a bankruptcy court's denial of discharge is therefore reviewed for abuse of discretion."[10] However, an appellant's claim that the evidence is insufficient to support the bankruptcy court's conclusions presents an issue of fact that is reviewed for clear error.[11] An appellate court must consider the evidence presented to the trial court in the light most favorable to the prevailing party, especially where the fact finder was, as here, the court rather than a jury.[12] A finding of fact is "clearly erroneous" only "if it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made."[13] Finally, the trial court's decision need only be "permissible," not "correct"[14] and, if

---

[8]   (...continued)
2013) (interpretation of a statute's requirements is a legal issue reviewed *de novo*).

[9]   *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991).

[10]   *In re Garland*, 417 B.R. at 810 (citation and internal quotation marks omitted).

[11]   *Id.* (citing *Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982); *In re BYOC Int'l, Inc.*, 233 B.R. 176, 1998 WL 780435 at *2 (10th Cir. BAP 1998) (sufficiency of the evidence is reviewed under a clearly erroneous standard, and trial court's decision need not be "correct," only "permissible")).

[12]   *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 510-11 (10th Cir. 1985) (such findings are "presumptively correct").

[13]   *Id.* at 811 (citation omitted).

[14]   *In re BYOC Int'l Inc.*, 233 B.R. 176, 1998 WL 780435 at *2 (10th Cir. BAP
(continued...)

plausible in light of the record, is not clearly erroneous even if the reviewing court would have made a different decision.[15] Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[16]

3. **Did the bankruptcy court err by denying a discharge under § 727(a)(4)(A) based on misstatements and omissions in Gordon's bankruptcy filings?**

This issue involves consideration of Gordon's interest in marital assets under state law, which is reviewed *de novo*,[17] as well as a challenge to the sufficiency of the evidence supporting the bankruptcy court's decision to deny a discharge, which is reviewed for clear error.

## III. BACKGROUND

### A. The Criminal Proceedings

In 2009, Gordon was charged in a federal court in Oklahoma with numerous securities laws violations in which he was alleged to have participated as a principal and co-conspirator. The charges focused on four corporate entities whose share prices Gordon and his co-conspirators manipulated for their personal benefit (the "pump-and-dump companies").[18] In order to manipulate stock prices in the pump-and-dump companies, it was necessary for each company's stock to be publicly traded. Manipulating the share prices required circumventing various

---

[14]   (...continued)
1998).

[15]   *Iverson v. Jawort (In re Iverson)*, 271 B.R. 213, 2001 WL 863444 at *6 (10th Cir. BAP July 31, 2001) (unpublished).

[16]   *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

[17]   *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) (appellate court reviews determinations of state law *de novo*).

[18]   Additional details of the criminal charges and proceedings may be found in *United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013), in which the Tenth Circuit Court of Appeals affirmed Gordon's convictions.

Securities and Exchange Commission ("SEC") restrictions designed to prevent just such manipulation. In 2005, several severe storms in the Gulf of Mexico had caused serious damage in the southern United States. Wanting to use that fact to "pump" stock prices, the conspirators targeted National Storm Management ("National Storm"), a privately-owned Illinois roofing and siding company. They presented the president of National Storm with various financing options for the company, and persuaded him to take the company public.

Gordon and a co-conspirator then arranged to merge National Storm with a publicly-traded shell company that had been incorporated in 2002 and was wholly owned by the co-conspirator ("Shell 1").[19] Shell 1's stock was deemed "restricted" under SEC rules, which impose numerous restrictions on the public trading of stocks, including detailed reporting requirements that must be met in order to freely trade a public company's stock. However, those restrictions do not apply to shares that are held by non-insiders of the traded company for more than two years. The owner of Shell 1 was clearly an insider of the company, and thus did not qualify for this exemption, so Gordon told him to offer some of his friends a thousand dollars each to claim they were shareholders. Gordon then prepared false and back-dated corporate records, showing two year old transfers of shares to those "nominees."[20] Gordon also prepared and issued legal opinion letters, which he had an associate attorney sign, stating that the shares were freely

---

[19] Such a transaction is called a "reverse merger," in which a privately-owned company acquires a publicly-traded company, thereby transforming itself into a publicly-traded company and eliminating the need to go through the burdensome disclosure process that is typically required prior to an initial public offering ("IPO") of stock.

[20] As relevant here, a "nominee" is "2. A person designated to act in place of another, usu[ally] in a very limited way." or "3. A party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others." BLACK'S LAW DICTIONARY, "nominee" (10th ed. 2014), *obtained from Westlaw* (2015 Thomson Reuters).

tradeable because the sellers qualified for the two-year ownership exemption.[21]

Once the newly-merged National Storm shares were freely tradeable, the conspirators initiated the "pump" part of their plan by engaging in coordinated trading of National Storm's stocks among many nominee accounts, creating a false impression that the stock prices were rising.[22] Thereafter, the conspirators issued massive fax and email "blasts," predicting strong market performance by National Storm's stock. The blasts contained many misleading statements, including implications that the projections themselves came from outside sources, when they were in fact prepared by the conspirators. Once outsiders began purchasing the stock, the conspirators took advantage of the price rise by "dumping" the National Storm shares at inflated prices. In all, the conspirators made more than $5 million by manipulating National Storm's stock in this way.

Two other pump-and-dump companies that were similarly manipulated by Gordon and his co-conspirators were Deep Rock Oil & Gas ("Deep Rock"),[23] in

---

[21] National Storm shares, like those of the other targeted companies, were traded on "Pink Sheets," rather than major stock exchanges. Pink Sheets are daily, inter-dealer publications of over-the-counter ("OTC") stocks that include the stocks' prices. Since Pink Sheet stocks are not traded on the major indexes, the targeted companies were not required to file periodic reports with the SEC.

[22] In the context of securities, "nominee account" means: "[a] brokerage account in which the securities are owned by an investor but registered in the name of the brokerage firm. • The certificate and the records of the issuing company show the brokerage as the holder of record. But the brokerage records show the investor as the beneficial owner of the securities in the nominee account." BLACK'S LAW DICTIONARY, "nominee account" under "account" (10th ed. 2014), *obtained from Westlaw* (2015 Thomson Reuters). The conspirators used nominee accounts to disguise their own ownership of the National Storm stock, which allowed them to engage in coordinated trading of the shares among themselves, while making it appear that many parties were trading the company's stock. In this way, the conspirators "primed" the stock's price by creating the appearance of high-volume trading of it, prior to broadcasting misleading promotional hype about the company.

[23] Deep Rock was the only one of the four targeted companies that was already publicly traded. Thus, no reverse merger was necessary to initiate the pump-and-dump scheme with respect to Deep Rock. However, as with the other companies, the conspirators parked shares of Deep Rock in nominee accounts in

(continued...)

which one of the conspirators already owned the majority of non-insider shares, and Global Beverage Company ("Global"). By manipulating Deep Rock and Global as they had National Storm, the conspiracy made another $5 million profit from sales of Deep Rock stock, and roughly $25 million from sales of Global stock.

The final company included in the criminal indictment against Gordon was International Power Group ("IPG"), a private company that Gordon reverse-merged with a publicly-traded company that was controlled by a long-time friend ("Shell 2"). Gordon instructed an assistant to his co-conspirator to prepare back-dated corporate documents for Shell 2, claiming that the originals had been lost. Again, Gordon prepared an opinion letter, stating that IPG shares were exempt from trading restrictions based on ownership by non-insiders for at least two years, which he had an associate attorney sign.[24] This letter was used to cause a transfer agent to issue unrestricted IPG shares, which were then gradually sold by Richard Singer, another co-conspirator, on Gordon's behalf. In November 2005, Singer wire-transferred approximately $1.7 million in proceeds from IPG share sales to pay off a construction mortgage on Gordon's residence (the "Residence"). Singer later prepared a false, back-dated document showing a sale of IPG stock from Gordon to Singer for the $1.7 million, the purpose of which was to avoid the government's forfeiture of the Residence.

In 2004, the SEC began investigating Pink Sheet companies that had unusual share trading and were being actively promoted, and concluded that some of the companies had engaged in similar activities, consisting of publicly-traded

---

[23] (...continued)
order to disguise their true ownership.

[24] The attorney who signed the opinion letters for both National Storm and IPG was Robert Bertsch, who represented another co-conspirator, New York businessman Richard Singer.

shell companies doing reverse mergers with private companies in order to publicly trade the private companies' shares. Gordon was contacted by the SEC in September 2005 because he represented some of the individuals and companies, including National Storm and Deep Rock, that the SEC was investigating. In the course of his conversation with the SEC, Gordon was "Mirandized,"[25] and then asked about the source of the National Storm and Deep Rock promotions. Gordon denied any knowledge regarding the source of those promotional campaigns.

In 2007, as the SEC investigation progressed, the federal government placed a caveat (or warning) on, among other properties, the Residence, and seized two of his Professional Corporation's bank accounts. Subsequently, the government filed a civil forfeiture action against the Residence, replacing the caveat with a *lis pendens* lien.[26] Mrs. Gordon responded to the forfeiture action, claiming she owned the Residence, and the civil forfeiture proceeding was stayed pending resolution of the criminal investigation.

In 2009, an indictment was issued that charged Gordon and his co-conspirators with numerous criminal violations arising out of the alleged pump-and-dump scheme. The criminal matter proceeded to trial in a federal district court in Oklahoma and, in early May 2010, Gordon was convicted by a jury on nine counts of wire fraud, five counts of securities fraud, five counts of money laundering, one count of engaging in a wire-fraud scheme, and one count of

---

[25]　Gordon was told that he could speak with counsel prior to answering any of the SEC's questions, and that he had the right to choose whether or not to answer those questions. In addition, Gordon was informed that giving false answers would potentially subject him to both civil and criminal penalties.

[26]　A *lis pendens* lien on title to real property is intended to prevent property subject to litigation from being transferred while that litigation is pending. Under the *lis pendens* doctrine, anyone who purchases property from a party to the pending litigation takes the property subject to the result of the litigation. *See* 5 TIFFANY REAL PROP. § 1294 (3d ed. 2014).

obstruction of justice. He was immediately incarcerated. The district court determined Gordon to be personally responsible for illegal gains from sales of IPG stock in the amount of $2.7 million, as well as for the total gains of the conspiracy from sales of the stock of National Storm, Deep Rock, and Global in an amount exceeding $43 million. A special assessment was imposed on Gordon in the amount of $2,300, and he was ordered to pay restitution in the amount of approximately $6.15 million.

Based on Gordon's criminal conviction, the district court entered three separate criminal forfeiture orders relating to his assets: 1) The first order was issued in September 2010, and forfeited approximately $2.75 million in assets directly traceable to the conspiracy, which included Gordon's interest in the Residence (to the extent of $1.7 million that was traceable to IPG stock sales, with the remainder of Gordon's interest in the Residence deemed to be a substitute asset)[27]; 2) the second order was issued on January 11, 2011 (four days after Gordon filed his bankruptcy petition), and forfeited Gordon's interest in several corporations, brokerage accounts, and other real property; and 3) the final order was issued in February 2011, and forfeited the entire Gordon Residence, subject to a settlement with Mrs. Gordon as to her interest in that asset.[28]

---

[27] Substitute assets are not directly forfeitable as being traceable to, or the proceeds of, a crime, and may only be forfeited in the event directly forfeitable assets are unavailable. "An asset cannot logically be both [directly] forfeitable and a substitute asset." *United States v. Bornfield*, 145 F.3d 1123, 1139 (10th Cir. 1998).

[28] The SEC obtained its own judgment against Gordon, in which Gordon was permanently enjoined from violating securities laws, fined civilly in the amount of $130,000, found civilly liable in an amount exceeding $50 million, and permanently barred from trading in penny stocks. Typically, penny stocks are equity securities that sell for less than five dollars per share. *See* Amended Judgment as to Defendant George David Gordon *in* Appx at 2885-89.

**B.     The Bankruptcy Proceedings**

Gordon initially filed his Chapter 7 Petition, Schedules, and Statement of Financial Affairs ("SOFA") on January 7, 2011, along with an application to proceed *in forma pauperis*, in which he claimed he was unable to pay the $306 fee for filing a Chapter 7 petition.  Gordon amended his filings on three separate occasions:  1) January 18, 2011, eleven days after the initial filing; 2) June 13, 2011, four months after the creditors meeting was held pursuant to § 341(a), and 3) December 1, 2011, after the United States Trustee's discharge complaint was filed and Gordon had retained counsel.

Gordon filed his bankruptcy without the assistance of bankruptcy counsel, and thus has no one to blame but himself for the inaccuracy of his bankruptcy filings.  Both his Schedules and his SOFA, which provide the basis for the case trustee, his creditors, and the bankruptcy court to determine his debts and assets, were rife with misstatements and omissions.  In order to promote bankruptcy's most fundamental purposes — granting honest but unfortunate debtors a "fresh start" while ensuring the best permissible outcome for creditors — the filing of these documents comes with an attendant burden of full and honest disclosure.  Gordon, who was a sophisticated businessman, attorney, and CPA, surely understood the implications of filing a bankruptcy petition.  Despite this, Gordon later attributed the pervasive inaccuracies in his Schedules to several causes that he presumably felt were not associated with fraudulent intent, including memory lapse, inaccessibility of records, mistake, immateriality, and unfamiliarity with bankruptcy law.  Now, he asks this Court to conclude that the voluminous evidence presented at trial is insufficient to support the bankruptcy court's finding that Gordon's proffered excuses did not overcome the badges of fraud that permeated his prepetition and postpetition conduct.

Throughout the bankruptcy case, Gordon took the position that he had no interest in the Residence or in several family vehicles, ownership of which he

attributed to Mrs. Gordon. Although he disclosed his ownership of the Professional Corporation, he listed its value as $0 and did not disclose in his bankruptcy papers any assets that he considered to be owned by the Professional Corporation.[29]

### C. The Gordon Residence and Vehicles

The Gordons purchased the real property on which the Residence would later be built in December 2000, the same year for which they reported net capital gains of nearly $20 million on their joint tax return (the "2000 Capital Gains"). That property was purchased without a bank loan and, pursuant to the Gordons' instructions, it was titled in Mrs. Gordon's name only, although the equity received from the sale of the Gordons' previous, jointly-owned residence was invested in the new one.[30] Approximately two years later, Mrs. Gordon obtained a construction-loan mortgage from Commerce Bank for construction of a home on the property. That mortgage was subsequently amended to add Gordon as a borrower as well, and both Gordons executed the promissory note for the construction loan. In 2003, the Gordons spent approximately $5.4 million building the Residence, and in 2005, they paid off the construction loan with a final payment of $1.7 million. The funds used to pay off the mortgage came from a Gordon co-conspirator, Singer, who later prepared a false, back-dated document showing a sale of IPG stock from Gordon to himself for the $1.7 million,

---

[29]   Gordon protested that he did not need to disclose the Professional Corporation's assets in his personal bankruptcy because the PC was a separate entity. *See, e.g.*, Telephonic Deposition of George David Gordon, Jr., Aug. 13, 2013, ("Depo, Vol 1"), p.59 *in* Appx at 705. However, by assigning no value to the PC as his asset, Gordon failed to account for assets owned by the PC, including bank accounts, accounts receivable, securities, furniture, decor, and office equipment.

[30]   Gordon claimed that his portion of the home sale funds was used to buy furniture and "probably the tennis court." Volume II of the Telephonic Deposition of George David Gordon, Jr., Sept. 19, 2013 ("Depo, Vol 2"), p. 273 *in* Appx at 919.

intending to assist Gordon's effort to prevent forfeiture of the Residence.[31]

Since the purchase and construction of the Residence, and throughout the bankruptcy proceedings, Gordon was adamant that the Residence was solely Mrs. Gordon's property. Despite this, Gordon neither transferred nor disclaimed any interest (whether marital, equitable, or other) he may have had in the Residence to Mrs. Gordon, as he could have done under Oklahoma law.[32] The Residence was Gordon's primary residence. Since its completion, he exercised ownership rights with respect to it, used marital funds from the 2000 Capital Gains to pay $50,000 in 2003-2010 property taxes on it, paid many of the utility accounts for the Residence (most of which were opened and maintained in Gordon's name), and generally treated it as his own. Gordon also listed the Residence as property he owned in two personal financial statements, submitted in November 2006 and May 2009, in order to obtain credit in his name only.[33] Similarly, all of the

---

[31] Because this $1.7 million payment was determined to be directly traceable to Gordon's fraudulent wire fraud scheme, that amount of the Residence's value was ordered forfeited by the criminal court in its first forfeiture order. Appx at 2644-48.

[32] Gordon could have transferred any interest he had in the Residence to Mrs. Gordon at any time by executing and recording a simple quitclaim deed. OKLA. STAT. tit. 16, § 18 (1910). Also, any person entitled to take an interest in a transferred asset, including real property, may disclaim that interest by executing and recording a written disclaimer. OKLA. STAT. tit. 60, §§ 751-759 (1973). A "disclaimer" is "a written instrument which declines, refuses, releases or disclaims an interest which would otherwise be succeeded to by a beneficiary, which instrument defines the nature and extent of the interest disclaimed thereby and which must be signed, witnessed and acknowledged by the disclaimant in the manner provided for deeds of real estate." OKLA. STAT. tit. 60, § 751(3). Moreover, "[n]o deed, mortgage, or contract affecting the homestead exempt by law . . . shall be valid unless in writing and subscribed by both husband and wife, if both are living and not divorced, or legally separated, except as otherwise provided for by law." OKLA. STAT. tit. 16, § 4 (1997). Thus, a married person cannot individually transfer marketable title to real property in Oklahoma unless his or her spouse either signs the instrument of transfer as a grantor, or is the grantee. OKLA. STAT. tit. 16, Ch.1, App., Std. 7.2 (2010). This restriction is intended to protect the "marital interest" in the parties' homestead. OKLA. STAT. tit. 16, Ch. 1, App., Std. 7.1 (1984).

[33] Appx at 1670-76. Gordon listed a value for the Residence of $4.5 million

<span style="float:right">(continued...)</span>

Gordon family cars (the "Vehicles") were titled solely in Mrs. Gordon's name, but were treated by the Gordons as joint property. Despite the titles, each member of the family, including Gordon, Mrs. Gordon, and their minor son, had a vehicle that was primarily used only by him or her.[34]

Mrs. Gordon was not employed during at least the ten-year period prior to Gordon's incarceration (May 2000 to May 2010), and it was Gordon's legal and accounting business, along with his investments, that paid the family's expenses. Beginning early in their marriage, Gordon began giving his wife shares of stock and money to be held in her own name, but he also held property in either his own name or the name of the Professional Corporation. This process resulted in Mrs. Gordon's acquisition of significant assets in her name only, which Gordon referred to as "her money."

Gordon filed his original Petition, *pro se*, on January 7, 2011.[35] Although Gordon was an attorney, a CPA, and a sophisticated securities investor, he claimed to have no real knowledge of bankruptcy law. His brother-in-law, Finis Cowan, who was also a non-bankruptcy attorney, assisted Gordon somewhat with preparing his Petition and Schedules. Gordon was incarcerated during the preparation of his bankruptcy filings, initially in Tulsa County Jail, where his access to information was limited. When Gordon's Petition and subsequent

---

[33]    (...continued)
in 2006 and $4.0 million in 2009. Although he listed Mrs. Gordon as the title holder of the Residence in both financial statements, the fact that Gordon listed it as one of his assets is strong evidence that he did not consider it to belong entirely to his wife.

[34]    Gordon assumed the vehicle he used was sold when he was incarcerated, but had no specific knowledge of a sale.

[35]    Gordon testified that he filed the Petition in order to stop the commencement of a trial in a civil suit against him in Texas, which was scheduled to begin a few days later. *See* Depo, Vol 1, *in* Appx at 710-12. According to Gordon, after he filed, he also "hoped that [the filing] would prevent the government from basically, you know, taking all my assets," but that was not his "primary intent" in filing the Petition. *Id.*

amendments were filed, however, he was housed at the Texarkana federal prison, where he had better, though still restricted, access to information. In his original Schedule A, Gordon denied having any interest in real property, and also stated that "the federal government ha[d] erroneously obtained a forfeiture judgment against his wife's home."[36] He then listed the $1.7 million forfeiture amount as a secured claim, stating that he was "unsure whether the government's Forfeiture Order is a secured claim for bankruptcy purposes but includes it in the interest of full disclosure."

The summary of Gordon's initial Schedules listed a total of $112,000 worth of personal property, $65,000 of which was claimed to be exempt. The personal property list did not include any vehicles. Gordon almost immediately amended his bankruptcy filings, on January 18, 2011, again acting *pro se*. He amended his filings again on June 13, 2011, still acting *pro se*, and added the following note to his statement disavowing his ownership of any interest in real property: "Further, debtor states that the home was titled in the debtor's wife's name. To the extent that the debtor could claim an equitable ownership in the home, any such interest was taken by forfeiture in the debtor's federal criminal law case." Finally, in August 2011, Ron Brown entered his appearance as counsel representing Gordon. Mr. Brown filed a final amendment of Gordon's filings in December 2011, approximately a month after Richard A. Wieland, United States Trustee ("UST"), filed an adversary proceeding against Gordon. The UST's complaint sought the bankruptcy court's denial of Gordon's discharge pursuant to, among other provisions, § 727(a)(2)(A) and (a)(4)(A).

In September 2012, while the adversary proceeding was pending, the Chapter 7 trustee appointed to administer Gordon's estate, Patrick J. Malloy III ("Trustee"), obtained the bankruptcy court's approval of a settlement with Mrs.

---

[36]     Schedule A to Gordon's 1/7/2011 Petition, *in* Appx at 1231.

Gordon in the main bankruptcy case.[37]  As part of the settlement, the Trustee agreed to release all avoidance claims the estate might have against Mrs. Gordon, along with any interests the estate had in the Gordons' marital assets.  In return, Mrs. Gordon paid the estate $300,000, and agreed to withdraw an objection she had filed to a "Coordination Agreement"[38] between the estate and the United States for the handling of claims and distributions in both the criminal and bankruptcy cases.

The adversary complaint was tried before the bankruptcy court over three days in October 2013.  The bankruptcy court issued a decision denying Gordon's discharge on March 31, 2014, finding that the UST had proven his case under both § 727(a)(2) and (a)(4).

## IV.  DISCUSSION

The bankruptcy court denied Gordon's discharge under two separate provisions of § 727(a).  Ordinarily, a debtor who requests a bankruptcy  discharge will be granted one.  However, "[t]he expectation is that, to be entitled to discharge, the debtor must deal fairly with creditors and with the court.  This obligation is imposed indirectly through a series of objections to discharge set out in Code § 727(a)."[39]  Thus, § 727(a) provides a mechanism for proof of certain conduct by a debtor that may result in a denial of discharge.  Subsection (a)(2) "establishes that the fair dealing necessary to qualify for a discharge includes refraining from actions intended to injure creditors, including the transfer, concealment or destruction of property."[40]  This provision targets asset transfers that were made within one year of the debtor's petition filing date, but also

---

[37]    *See* Order, dated Sept. 10, 2012, *in* Appx at 989-91.

[38]    Appx at 984-87.

[39]     4 NORTON BANKR. L. & PRAC. 3d § 86:3 (2014).

[40]    *Id*. § 86:4.

includes transfers made prior to that time that are concealed by the debtor within one year.[41] By its express terms, § 727(a)(2) covers only conduct that occurs prior to the initiation of a bankruptcy case. In contrast, § 727(a)(4) specifically targets false oaths made by debtors "in or in connection with the [bankruptcy] case." Typically, such false statements are made in the debtors' bankruptcy filings or in their testimony at the § 341 meeting of creditors. As such, the conduct alleged by a plaintiff in support of a claim under § 727(a)(2) would ordinarily be different from conduct that is alleged to support a § 727(a)(4) claim.

## A.    Fraud under § 727(a)(2)(A)

Evidence that a Chapter 7 debtor fraudulently transferred or concealed property in order to deceive creditors or the bankruptcy court may result in the denial of the debtor's discharge under subparagraph (a)(2) of § 727, which provides:

> (a) The court shall grant the debtor a discharge, unless —
>
>> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed —
>>> (A) property of the debtor, within one year before the date of the filing of the petition.[42]

In order to obtain a denial of discharge under § 727(a)(2)(A), a plaintiff must show, by a preponderance of the evidence, that "(1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the [debtor], (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder,

---

[41]    *See, e.g., United States Trustee v. Garland (In re Garland)*, 385 B.R. 280, 296 (Bankr. E.D. Okla. 2008) (failure to disclose property transfer more than one year prior to bankruptcy may still justify discharge denial as a "continuing concealment"), *aff'd*, 417 B.R. 805 (10th Cir. BAP 2009).

[42]    § 727(a)(2)(A).

delay, or defraud a creditor."[43]

This Court has previously held that "despite an unqualified transfer of legal title, debtors who retain beneficial use of the property and treat it as their own continue to hold a beneficial interest that must be disclosed."[44] The *Garland* decision enumerated several "badges of fraud" that are suggestive of fraudulent intent when transferring property, including three that are applicable here: gratuitous property transfers, the debtor's continued use of the property after its transfer, and transfers to family members.[45] Concealment of assets with the intent to "hinder, delay, or defraud a creditor" within one year of filing a bankruptcy petition constitutes a violation of § 727(a)(2). In this case, Gordon's asset transfers to his wife occurred more than one year prior to his bankruptcy. However, "[u]nder the 'continuous concealment' doctrine, a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year."[46] Thus:

> In a situation involving a transfer of title coupled with retention of the benefits of ownership, there may, indeed, be a concealment of property. Where this is the case, however, the concealment is present not because retention of the benefits of ownership conceals the fact that the debtor no longer has legal title, but rather because the transfer of title represents to the world that the debtor has transferred away all his interest in the property while in reality he has retained some secret interest — a secret interest of

---

[43]     *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997). This opinion actually listed "property of the estate" as item 2, but no bankruptcy estate exists before the case is filed, so § 727(a)(2)(A) applies, as it says, to "property of the debtor" that was transferred prepetition, not to property of the estate, which is covered by § 727(a)(2)(B).

[44]     *In re Garland*, 417 B.R. at 816 (discussing a § 727(a)(4) claim).

[45]     *Id.* at 815.

[46]     *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993). *See also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir.1997) (fraud can be inferred from transfer of an asset's title while continuing to exercise dominion over it).

which retention of the benefits of ownership may be evidence.[47]

The UST asserted, among other allegations, that Gordon placed many, if not most, of his significant assets solely in his wife's name in order to protect them from his own creditors, and that his continued use and possession of those assets indicates that both Gordon and his wife considered the ownership of them to be, at the very least, joint. When a transfer is made between parties who between themselves act as though no transfer actually took place, while holding out to others that the transfer was valid, both the transfer and the insistence that it was valid may be fraudulent. Thus, the bankruptcy court found that Gordon had retained "*all* of the benefits of ownership [of the Residence] — except legal title — which he used to his full advantage when it suited him."[48] These facts establish that the transfer of legal title to the Residence was not a valid transfer, but was a fraudulent concealment of the property from Gordon's creditors. In addition, the parties' conduct that perpetuated the ruse that the transfer was valid constituted a concealment that continued for as long as the parties maintained the ruse.

The UST alleged, and the bankruptcy court found, that although Gordon maintained that certain assets belonged solely to Mrs. Gordon, he actually retained an equitable interest in them, particularly with respect to the Residence and the Vehicles. Gordon's maintenance of that ruse was intended to shield those assets from his creditors, and continued up to, and even after, the filing of his Petition. This constitutes a "continuing concealment" subject to the reach of § 727(a)(2).

---

[47] *Rosen v. Bezner*, 996 F.2d at 1532.

[48] *Wieland v. Gordon (In re Gordon)*, 509 B.R. 359, 369 (Bankr. N.D. Okla. 2014) (emphasis in original).

### 1. Detriment to creditors

Gordon asserts that it was error for the bankruptcy court to deny his discharge pursuant to § 727(a)(2)(A) absent proof of resulting harm to his creditors. However, notably absent from the elements listed by the Tenth Circuit Court of Appeals for a successful fraudulent transfer claim under this provision is any requirement that the debtor's creditors suffered financially as a result of the transfer. Nonetheless, Gordon asserts that the failure to prove such a detriment should have doomed the UST's claim, relying principally on statements made in *Booth* and *Miller*.[49]

Neither *Booth* nor *Miller* is binding precedent on this Court, but the problem with Gordon's reliance on them lies in the fact that the statements he cites are *dicta*. *Booth* simply states that a debtor's intent with respect to a transfer must be "more than just an intent by the debtor to prefer a creditor," and "must be coupled with the transfer of the debtor's property which reduces assets available to other creditors."[50] In so stating, the *Booth* court relied on a 1985 Massachusetts bankruptcy court case, then noted that, '[t]his distinction has been expressly recognized in the Tenth Circuit."[51] However, the statement was unnecessary to the issue before the court, which was whether the debtor's transfers of money and farm equipment to his live-in girlfriend were in payment of valid loans made by her to him, or were converted from capital to debt in order to defraud the debtor's ex-wife.

---

[49]    *Booth v. Booth (In re Booth)*, 70 B.R. 391 (Bankr. D. Colo. 1987); *Wieland v. Miller (In re Miller)*, 448 B.R. 551 (Bankr. N.D. Okla. 2011).

[50]    *In re Booth*, 70 B.R. at 395.

[51]    *Id.* (citing *Rutter v. Gen. Motors Acceptance Corp.*, 70 F.2d 479 (10th Cir. 1934)). Not only was *Rutter* decided well before the provision at issue here was even enacted, it was decided based on then-existing Oklahoma preference law, which required proof of either fraudulent intent or absence of fair value. Thus, the *Rutter* decision simply does not support the interpretation of it made in *Booth* and *Miller*.

Even more significantly, the case that *Booth* cites as the Tenth Circuit's recognition of the "reduced assets" requirement, *Rutter*, is not valid support for the proposition. *Rutter*, a 1934 case, was decided under § 14 of the Bankruptcy Act of 1898 and then-existing Oklahoma law. The issue in *Rutter* was whether a transfer from a husband to a wife was fraudulent under an Oklahoma provision that stated that "no transfer can be adjudged fraudulent solely on the ground that it was not made for a valuable consideration."[52] The *Rutter* court noted that the establishment of a preference, alone, is not grounds for the denial of a discharge, saying, "[t]here is a clear and broad distinction between a preferential transfer and a fraudulent transfer."[53] Quite simply, *Rutter* is wholly inapposite to the current issue.

In both *Booth* and *Miller*, the debtors' discharges were denied. However, in *Miller*, one allegedly fraudulent transfer was excluded from consideration because the plaintiff failed to offer evidence of the asset's value. In eliminating that single transfer, which did not affect the discharge denial, the court relied on the *dicta* in *Booth* to the effect that intent must be tied to a transfer that reduces assets available to creditors in order to satisfy the statute.[54]

The Tenth Circuit stated in the *Strunk* decision (again, as *dicta*) that "[d]etriment to a creditor need *not* be shown in order to establish fraudulent concealment or a false oath barring discharge."[55] The nondischargeability claims

---

[52]    *Rutter*, 70 F.2d at 481.

[53]    *Id.* at 481-82.

[54]    *In re Miller*, 448 B.R. at 574-75 & n.76.

[55]    *Farmers Co-op Ass'n v. Strunk*, 671 F.2d 391, 396 (10th Cir. 1982) (emphasis added) (this statement is *dicta* as to a § 727(a)(2)(A) claim because it was made in the court's discussion of false oath). A similarly superficial statement rejecting a § 727(a)(2) detriment element was made in *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 923 (Bankr. D. Utah 2006) (stating, in a § 727(a)(4) case, that "as with § 727(a)(2) . . . no actual detriment to a creditor

(continued...)

in *Strunk* included both fraudulent concealment and a false oath, based on bad checks written by the debtor. The checks were dishonored by the debtor's bank, which the debtor claimed caused him to believe that the account had no funds in it, which is what he reported in his schedules. The debtor asserted in defense that he had tendered a check to the trustee in the amount of the funds that were in the account on the petition date and, therefore, no harm resulted. This proffered defense was rejected by the court, which affirmed the bankruptcy court's denial of discharge.

Courts in other jurisdictions have soundly rejected a detriment element under § 727(a)(2).[56] In particular, a Michigan bankruptcy court reasoned:

> This court believes that the reasons that justify ignoring the effects of debtor's actions in nonexempt-to-exempt cases, justify ignoring the effects of debtor's actions in other § 727(a)(2) cases as well. First, the statute focuses on debtor's intent at the time of the transfer, and not at the results of the transfer to see if the creditor has been delayed, hindered or defrauded. Second, where Congress wants courts to apply an effects test it says so. For example, under § 547(b) a transfer is voidable as a preference if, as a result of the transfer, the creditor receives more than he would upon liquidation. The rule is not that a transfer is voidable as a preference if the debtor intends to prefer a creditor. Hence it is clear that the Trustee can make his case under § 727(a)(2), regardless of whether a creditor is actually delayed, hindered or defrauded. All that the Trustee must prove is that the debtor intended to hinder, delay or defraud creditors when it transferred property within a year of filing.[57]

In any event, serious consideration of whether § 727(a)(2) requires proof of a detriment to creditors is unnecessary in this case because such a detriment was established by the UST's settlement with Mrs. Gordon. That settlement, which was based on Gordon's marital or equitable interest in property obtained by

---

[55]     (...continued)
needs to be shown").

[56]     *See* 4 BANKR. SERV. L. ED. § 39:121 (2014) (proof of harm is not required element of transfer or concealment under § 727(a)(2)).

[57]     *Taunt v. Wojtala (In re Wojtala)*, 113 B.R. 332, 336 (Bankr. E.D. Mich. 1990).

Gordon but held solely in Mrs. Gordon's name, resulted in the recovery of $300,000 for the bankruptcy estate. Those funds would not have been available to Gordon's creditors had the UST simply accepted Gordon's denial of any interest in those assets.

## 2. Sufficiency of the evidence

Not surprisingly, this case presented the Trustee with significant challenges with respect to gathering estate assets. Gordon outright denied ownership, claimed not to remember details of many transactions, was evasive, and failed to keep adequate records of his business dealings. He asserted a variety of excuses for his omissions and misstatements, including that he was not a bankruptcy attorney, was incarcerated and therefore unable to obtain documents, didn't understand marital property rights, and believed any rights he may have had to have been forfeited. The principal basis for the bankruptcy court's rejection of Gordon's defenses to the denial of discharge in this case was his lack of credibility.[58] The sheer number of mistakes, omissions, and denials of access to

[58]     Ordinarily, this Court would give the bankruptcy court great deference with respect to witness credibility. *See, e.g., Vaughn v. United States (In re Vaughn)*, 765 F.3d 1174, 1180 (10th Cir. 2014) ("Where . . . certain 'findings are based on determinations regarding the credibility of witnesses, Rule 52(a) [of the Federal Rules of Civil Procedure] demands even greater deference to the trial court's finding[s].'" (quoting *Bessemer City*, 470 U.S. at 565)). *See also* Fed. R. Civ. P. 52(a)(6), made applicable to adversary proceedings by Fed. R. Bankr. P. 7052 (appellate court must give due regard to trial court's opportunity to judge witness credibility). The UST relies on this concept in his brief, despite the lack of any such ability of the bankruptcy court to judge Gordon's credibility at trial. Gordon did not appear at trial, and his only testimony came from the written transcript of a telephonic deposition that was taken not long before trial. Under these circumstances, the bankruptcy court was in no better position to judge the credibility of the debtor than is this Court. However, Bankruptcy Rule 9017 makes the Federal Rules of Evidence applicable to bankruptcy cases, and Federal Rule of Evidence 609(a) provides that evidence of a criminal conviction of "any crime regardless of the punishment . . . must be admitted [for purposes of attacking a witness's character for truthfulness] if the court can readily determine that establishing the elements of the crime required proving . . . a dishonest act or false statement." Thus, the bankruptcy court was entitled to rely on Gordon's securities fraud convictions in concluding that his deposition testimony was not credible.

documents that Gordon asserted would alone be enough to disregard his testimony. When combined with his conviction for securities fraud, it is difficult to deny an overwhelming aura of fraudulent intent.

The situation in the present case is remarkably similar, in some respects, to the one presented in this Court's 2009 *Garland* decision.[59] In *Garland*, the debtor was a semi-retired plaintiffs' class-action lawyer who, like Gordon, claimed no interest in the residence in which he had lived for many years prior to filing for bankruptcy relief. Although Mr. Garland's machinations with the title to his residence went far beyond simply titling the property in someone else's name, his issues with the federal government were tax-related rather than criminal. As did Gordon, Garland stated on his Schedule A that he had no "legal, equitable, or future interest" in any real property, claimed the stock he owned in his Professional Corporation was without value, and failed to list his ownership or directorship in a number of businesses, as well as his signatory authority on several bank accounts. Also like Gordon, Garland asserted that he was not required to list his residence as his property because he had no ownership interest in it. This Court rejected that contention, stating:

> [I]n analogous cases, bankruptcy courts have determined that, despite an unqualified transfer of legal title, debtors who retain beneficial use of the property and treat it as their own continue to hold a beneficial interest that must be disclosed. . . .
>
> . . . . . . .
>
> . . . Debtor had continuous and exclusive use of the Property, provided improvements and maintenance on the Property, and paid the Property's expenses, both before and after he allegedly relinquished his ownership of it. Each and every transfer of the Property involved Debtor's friends or family and, in addition, Debtor was actively involved in the formation of the corporation whose sole purpose was to foreclose on the Property and thereby eliminate the IRS's tax liens. Despite these facts, Debtor did not even list the Property as property "held" by him for another on his SOFA or his

---

[59] *United States Trustee v. Garland (In re Garland)*, 417 B.R. 805 (10th Cir. BAP 2009).

schedules . . . .[60]

Like Garland, Gordon retained continuous use of the Residence and the Vehicles, provided maintenance for them, and paid their expenses the entire time those assets were titled in Mrs. Gordon's name. In addition, the money with which Mrs. Gordon purportedly purchased the Residence came partially from the sale of the Gordons' joint property. And the property that generated the portion of the purchase price that was paid by Mrs. Gordon had originally been given to her by her husband, who thereafter increased its value through his (fraudulent) investments. Thus, the criminal court determined that $1.7 million of the money that was used to pay off the mortgage on the Residence was *directly* traceable to Gordon's fraudulent securities scheme. Finally, Gordon also listed the Residence as property he owned in two personal financial statements, submitted in November 2006 and May 2009, in order to obtain credit.

In Oklahoma, both real and personal property that is acquired during a marriage is presumed to be marital property, regardless of how the title to the property is held.[61] Gordon's assertion that he believed this principle only applied to divorce actions belies his general knowledge of this concept.[62] He certainly knew enough about his state's property laws to understand that even if the Residence was titled solely in his wife's name, he still held, at the very least, a

---

[60]  417 B.R. at 816-17.

[61]  *Manhart v. Manhart*, 725 P.2d 1234, 1240 (Okla. 1986) (both real and personal property acquired during marriage is presumed marital property); *Garrett v. Gordon*, 314 P.3d 264, 271 (Okla. Civ. App. 2013) (property acquired during marriage is presumed to be marital property); *see also* OKLA. STAT. tit. 43, § 121(B) (1985) ("As to . . . property, whether real or personal, which has been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties, the court shall, subject to a valid antenuptial contract in writing, make such division between the parties as may appear just and reasonable").

[62]  *See, e.g.*, Depo, Vol 1, p.46, ll. 11-20 *in* Appx at 692.

contingent marital or equitable interest that he had not validly extinguished.[63] There is ample evidence in the record that supports the bankruptcy court's conclusion that Gordon titled major assets solely in his wife's name because he wanted to keep them out of the reach of his own creditors and, given the elaborate fraud he was perpetrating, Gordon surely understood that there were likely to be claims made against him.

Gordon's conduct constituted a fraud against his creditors in nearly every sense of the word. "There is little question that if an individual transfers *title* of an item but continues to exercise dominion over it, that fraud could be inferred."[64] Knowingly placing property in his wife's name while continuing to use the property as his own and repeatedly asserting that the property was not his constituted both fraud and the continuing concealment of that fraud. Thus, Gordon had an equitable or marital interest in, at the very least, both the Residence and the Vehicles, which he concealed by placing title to those assets in his wife's name. His concealment of his interests in those assets continued up to and after the filing of his Petition through his ongoing denials of his interests, and those denials were made with the intent to conceal his assets from his creditors and mislead them regarding his assets. Because these facts fully satisfy the statutory elements of a § 727(a)(2) claim, we affirm the bankruptcy court's judgment under that provision.

### B.   False Oath under § 727(a)(4)

Gordon was also denied discharge pursuant to the following provision:

(a) The court shall grant the debtor a discharge, unless —

.         .         .

---

[63]    *United States Trustee v. Garland (In re Garland)*, 385 B.R. 280, 295 (Bankr. E.D. Okla. 2008) (beneficial interest in property may be found if a debtor exercises control over property, even without legal title to it), *aff'd*, 417 B.R. 805 (10th Cir. BAP 2009).

[64]    *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir.1997).

(4) the debtor knowingly and fraudulently, in or in connection with the case —
         (A) made a false oath or account.[65]

The various discharge exceptions of § 727(a) are independent, and a plaintiff need only prove the elements of one exception by a preponderance of the evidence in order to obtain a denial of discharge.[66]  Thus, a judgment under any § 727(a) subparagraph is sufficient for a denial of discharge.  Having affirmed the bankruptcy court's ruling based on § 727(a)(2), this Court need not consider that court's § 727(a)(4) ruling.  Nonetheless, as the bankruptcy court considered and ruled on both exceptions, this Court will also.

As he did with respect to the § 727(a)(2) denial of discharge, Gordon challenges the bankruptcy court's denial of his discharge under § 727(a)(4) on the basis of insufficiency of the evidence.  The bankruptcy court based its decision to deny discharge under § 727(a)(4)(A) primarily on Gordon's failure to disclose his interest in the Residence.  Gordon asserts that the bankruptcy court erred in reaching this conclusion because he did adequately disclose the existence of the Residence, both by the address he listed as the location of his personal property and by his statements that although the Residence belonged solely to Mrs. Gordon, the criminal court had erroneously forfeited any interest he might have had in it prior to the filing of his Petition.[67]  Gordon also asserts that the criminal forfeiture eliminated any interest he might otherwise have had in the Residence and, therefore, his failure to list the Residence as an asset was the truth.[68]

---

[65]    § 727(a)(4)(A).

[66]    *In re Garland*, 417 B.R. at 810-11.

[67]    In his initial Schedule A, filed on January 7, 2011, Gordon indicated that he did not own any real property, and stated also that "the federal government has erroneously obtained a forfeiture judgment against [Gordon's] wife's home at 10726 S. Lakewood, Tulsa, OK." Appx at 1231.

[68]    Only the first forfeiture order, which was entered on September 15, 2010,
(continued...)

This Court may affirm on any ground that is supported by the record[69] and, without reaching the merits of Gordon's assertion that any interest he had in the Residence when he filed his Petition had been forfeited, we conclude that there was ample other evidence presented to the bankruptcy court to support its ultimate conclusion that Gordon had made prohibited false oaths. Principally, Gordon failed to accurately disclose in his Schedules real and personal property in which he had an interest, and also failed in his SOFA to disclose financial accounts that he either controlled or had signatory authority over within the one-year period prior to filing his Petition, and companies in which he was an officer or director within the six-year period prior to filing his Petition.[70]

---

[68] (...continued)
actually predated Gordon's filing of his Petition and Schedules. In those Schedules, Gordon asserted that he did "not own interests in any real estate but the federal government has erroneously obtained a forfeiture judgment against his wife's home." The 2010 order forfeited Gordon's interest in the Residence "to the extent of $1,702,000, which is traceable proceeds to the Count 23 wire fraud scheme," and the remainder of the Residence as a "substitute asset." Order for Criminal Forfeiture Money Judgments, Preliminary Order of Forfeiture of Property and Order for Forfeiture of Substitute Asset ¶¶ 4-5 *in* Appx at 2646. With respect to Gordon's assertion that the prepetition forfeiture eliminated any interest he may have had in the Residence, we note that the $1.7 million forfeiture in that order represents less than half of the Residence's value, according to Gordon's own valuations. Thus, in a financial statement he submitted to Commerce Bank in 2009, Gordon listed the value of the Residence as $4 million. Appx at 1669-70. In addition, Gordon testified in connection with the bankruptcy that he and Mrs. Gordon spent approximately $5.4 million on construction of the Residence in 2003. Appx at 835, 838. Under these valuations, Gordon would have retained, at the very least, a contingent interest in the Residence, over and above the $1.7 million forfeiture, because the criminal court designated the remainder of the Residence only as a "substitute asset."

[69] *Buke, LLC, v. Eastburg (In re Eastburg)*, 447 B.R. 624, 632 (10th Cir. BAP 2011).

[70] Schedule A requires debtors to list all of their real property, and specifically directs them to include all real property in which they have "any legal, equitable, or future interest." In addition, married debtors are instructed to "state whether the husband, wife, both, or the marital community own the property by placing an 'H,' 'W,' 'J,' or 'C' in the [appropriate] column." Schedule B requires debtors to list all of their personal property, and specifies various categories of property that must be listed, including stock and interests in incorporated and unincorporated business, interests in partnerships or joint

(continued...)

On Schedule B, Gordon indicated that he did not own any vehicles. In response to ¶ 13 of Schedule B, which asks for "[s]tock and interests in incorporated and unincorporated businesses," Gordon attached a list of nine companies, plus "[v]arious illiquid or insolvent penny stocks," to which he assigned a total value of $46,100. The Professional Corporation, which was listed first, was assigned an estimated value of "-0-".[71] Gordon admitted many of the inaccuracies in his deposition, but blamed them on his memory, lack of access to records, mistake, and misunderstanding of the law. For example, when questioned about his failure to disclose accounts with Fidelity Investments and tradeMONSTER, Gordon replied "I just missed it. Okay?"[72] Likewise, with respect to his failure to list EffTec International stock, Gordon responded that it was "[p]robably an oversight,"[73] regarding an undisclosed promissory note from LifeStyle Innovations, he stated, "[b]ecause I had forgot about it. And LifeStyle has nothing in it anyway,"[74] and, finally, as to shares in SGD Holdings that were not disclosed in his initial Schedules, he claimed he "thought [those] were

---

[70]    (...continued)
ventures, accounts receivable, equitable or future interests not listed in Schedule A, office equipment, furnishings and supplies, and "[o]ther personal property of any kind not already listed." Like Schedule A, Schedule B also directs married debtors to disclose whether such property is held by one or the other spouse, jointly, or by the marital community. Paragraph 18 of the SOFA requires individual debtors to disclose "all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation . . . or in which the debtor owned 5 percent or more of the voting or equity securities," within the six-year period prior to filing their bankruptcy petition.

[71]    Appx at 1235.

[72]    *Id.* at 882. Earlier in his deposition, Gordon stated that he didn't remember the Fidelity account "when we had to file in a hurry." *Id.* at 730. However, Gordon signed the bankruptcy papers in November 2010 and they were held until he later learned that a lawsuit against him was going forward. Thus, his claim that the documents were prepared and filed "in a hurry" is inaccurate.

[73]    *Id.* at 883.

[74]    *Id.* at 885-86.

disclosed in my bankruptcy filings."[75]

Gordon also testified that he "just didn't recall having signatory authority" on the Gordons' household checking accounts,[76] and that when his Petition was filed in January 2011, he was in jail and "didn't have anything" in the way of financial records with which to prepare his filings.[77] Gordon did list Delvest, Inc., of which he claimed to own 83%, in his initial Schedule B, but assigned it a value of $30,000, even though it owned several hundred thousand dollars worth of real property. When asked how he arrived at that valuation, Gordon stated "I don't recall."[78]

The number of false statements made by Gordon in his bankruptcy papers is overwhelming. It is inconceivable that he did not know he had some retained interests in the marital assets that he gave to his wife, whether or not he believed his interests to be valuable. It is similarly inconceivable that he would fail to disclose his interests in marital assets because of criminal forfeiture orders that post-dated his Petition. In any event, throughout the bankruptcy proceedings, Gordon continued to deny that he ever had any interest in the marital assets. When questioned about any marital interest he may have had in assets titled solely in his wife's name, Gordon responded, "I don't believe I had a marital interest" because "I'm not a divorce lawyer, but I don't believe a marital interest even forms until a divorce is filed . . . ."[79] Moreover, the "most important[]" reason he

---

[75]    *Id.* at 884.

[76]    *Id.* at 707.

[77]    *Id.* at 786, 791-92.

[78]    *Id.* at 892. Although Gordon claimed to have later revised his valuation of Delvest to $230,000, that figure does not appear in any of the amended Schedules he filed. He did, however, testify at the creditors meeting that "[t]he Delvest assets should have been listed as $230,000, not $30,000." *Id.* at 1346.

[79]    *Id.* at 689-90, 692.

did not disclose an interest in the Residence was that it "was forfeited to the government in September of 2010."[80] Likewise, although Gordon admitted that he had control of Delvest when he filed his Petition, it was only "for like, three days."[81] In addition, Gordon did not disclose sales of some personally-owned assets because "I didn't believe the sale of stock and brokerage accounts counted as transfers, so I did not disclose it."[82]

Finally, Gordon repeatedly asserted that he didn't need to list any assets owned by the Professional Corporation in his bankruptcy filings because assets owned by a separate entity are not his personal assets.[83] It is true, as Gordon contends, that he was not required to itemize the assets of his wholly-owned Professional Corporation or of Delvest in his personal bankruptcy. However, he was required to state values for those companies that took into account the assets that the companies owned. Indeed, Gordon testified that he listed the corporations that he owned, but not their assets, noting, "I just put what the value of the corporations were."[84] But Gordon did not state valid values for the companies he owned in his filings. Rather, he assigned a zero value to the Professional Corporation, and a value of $30,000 to his Delvest interest. Although a property owner is considered to be competent to testify about the value of his own property, Gordon's value figures apparently were not based on an impartial assessment of relevant facts.

---

[80]    *Id.* at 689-90 (referring to the criminal court's first forfeiture order).

[81]    *Id.* at 1244 (referring to the criminal court's second forfeiture order that was entered 4 days after Gordon filed his Petition).

[82]    *Id.* at 705-06.

[83]    *Id.* at 705, 795, 826, 871.

[84]    *Id.* at 795.

The appellate record is replete with evidence from which the bankruptcy court could have denied Gordon's discharge based on his false oaths. We cannot conclude that the findings underpinning that holding were clearly erroneous. Our review of the record reveals that Gordon made numerous false statements and omitted much requested information in his bankruptcy filings. The bankruptcy court did not believe, nor does this Court, that the many inaccuracies in Gordon's filings resulted from memory lapses, lack of legal knowledge, or mistake. Rather, they were intentionally made in order to keep as many of Gordon's assets out of the hands of his creditors as possible. Gordon was a sophisticated debtor who understood the law (of both bankruptcy and marital property) well enough to interpret it in ways that were beneficial to him. He consciously decided to make only a half-hearted effort to list assets in his bankruptcy filings, anticipating that he could offer up any number of excuses for any inaccuracies that were discovered. In particular, Gordon's assessment of the Professional Corporation's value at $0 (which should have included whatever assets it had, such as stocks, cash, accounts receivable, and furniture), based on his opinion that "after three or four days after I filed bankruptcy, I no longer owned [the PC]"[85] was deliberately misleading. Both Gordon's conduct and his testimony exhibit a complete disregard for the bankruptcy system, which he seems to view as simply a mechanism by which to avoid personal responsibility. The bankruptcy system is set up to protect "honest but unfortunate debtors," not those who would abuse it to further their own interests. The bankruptcy court's conclusion that Gordon made false oaths within the purview of § 727(a)(4)(A) is not clearly erroneous.

---

[85]    *Id*. at 722. Gordon also admitted to using nearly all of the PC's assets to pay his criminal attorneys' fees, contending that those fees had been "a business expense." *Id*. at 833.

## V. CONCLUSION

For the reasons stated herein, the bankruptcy court's order denying Gordon's discharge pursuant to § 727(a)(2)(A) and (a)(4)(A) is affirmed.