**FILED**

**U.S. Bankruptcy Appellate Panel**
**of the Tenth Circuit**

**October 23, 2015**

**Blaine F. Bates**
**Clerk**

UNPUBLISHED

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE TENTH CIRCUIT

| | |
|---|---|
| IN RE IRMA EILEEN KIDD, | BAP No. KS-14-065 |
| Debtor. | |
| | |
| PATRICIA A. GEPNER, | Bankr. No. 11-12357 |
| Plaintiff – Appellant, | Adv. No. 11-05291 |
| | Chapter 7 |
| v. | |
| IRMA EILEEN KIDD, | OPINION |
| Defendant – Appellee. | |

Appeal from the United States Bankruptcy Court
for the District of Kansas

Before THURMAN, JACOBVITZ, and HALL, Bankruptcy Judges.

JACOBVITZ, Bankruptcy Judge.

This appeal is taken from a bankruptcy court judgment in favor of the debtor on appellant's adversary complaint seeking denial of debtor's discharge. We affirm.

## I. Background, Facts, and Procedural History

Plaintiff/Appellant Patricia Gepner ("Pat") filed an action in Kansas state court in August 2010 against Debtor, Irma Kidd ("Irma"), after Irma failed to pay her debt owed to Pat. The pendency of that lawsuit ultimately led Irma to file her Chapter 7 bankruptcy petition on August 1, 2011 (the "Petition Date"). Irma's debt to Pat stemmed from monies Pat loaned to Irma's husband, Terry Kidd

("Terry"), to operate his retail gift shop in Augusta, Kansas called "Kidd's Early Bird Gifts" (the "Store").

Irma and Terry were married many years until Terry's death in December 2006. Both Irma and Terry were teachers. Terry opened the Store in the 1990s. In 1998, the Store was damaged by flood and, thereafter, the business struggled. In the late 1990s, Pat began occasionally helping out in the Store, although she was not considered an employee and was not paid for her services. In June 1999, Pat began periodically advancing money to Terry for his use in running the Store. Pat made the final advance in January 2004. In April 2004, Terry experienced a mild stroke. After that, he only briefly returned to the Store, which closed for good in May 2004.

In July 2005, Terry and Pat agreed to document the advances Pat had made to Terry as a loan. Pat and Terry told Pat's daughter, Vicki, the terms they wanted, and she prepared a simple written agreement for them to sign. Terry told Irma, who was previously unaware that Pat had provided funds for the Store, that he wanted her to sign the agreement as well. Irma added some handwritten changes to the original document, including a reduction of the amount due from $38,147.89 to $34,647.89, based on a $3,500 payment Terry had made in 2001. Pat, Terry, and Irma all signed the agreement (the "July Agreement"). Vicki later retyped the July Agreement to incorporate Irma's hand-written terms, and the parties executed that version of their agreement in November 2005 (the "November Agreement," together with the July Agreement, the "Loan Agreement"). The November Agreement did not alter any of the terms of the July Agreement.

Until the July Agreement, there had been no written or oral agreement regarding the advances, and no discussion of interest or other repayment terms. Although Irma objected to the July Agreement, she nonetheless signed both it and the November Agreement, thereby agreeing to pay the debt if Terry died before

he paid the debt in full.  The Loan Agreement provided:

> I, Terry Kidd, promise to pay Patricia Ann Gepner the sum of $34,647.89 plus 5% interest from the date of last disbursement on the amount borrowed from June 10, 1999 through January 29, 2004.  In the event of my death prior to completion of payment of this debt in full, the balance of the debt still outstanding will be assumed by Irma Kidd.  The full amount of this debt shall be paid back in full by August 1, 2010.  In the event Patricia Ann Gepner passes before , Terry Kidd, the debt can't be paid until his  death.[1]

Only one payment was made under the Loan Agreement before Terry died in December 2006.  Irma sent that $500 payment to Pat with a handwritten note stating it was to be applied to the Loan Agreement.[2]

In September 2006, Terry received $26,607 in disability benefits.  Terry deposited the funds into an account at Commerce Bank owned by Terry and Irma's son and daughter-in-law, David and Jennifer Kidd ("David and Jennifer's Commerce Bank Account").  Irma did not have an ownership interest in the disability benefits when Terry received and transferred the funds into David and Jennifer's Commerce Bank Account.

A few months after Terry's death, Irma received approximately $102,000 as the sole death beneficiary under two life insurance policies Terry owned.  Irma deposited those funds into David and Jennifer's Commerce Bank Account.  Irma also inherited 76 shares of Prudential stock upon Terry's death.  Irma signed a Small Estates Affidavit identifying herself as the only beneficiary of the decedent

---

[1]    Appellee's Appendix ("Appellee's App.") at 501.

[2]    On the day Terry, Irma, and Pat signed the November Agreement, they also signed a second agreement for repayment of a separate $10,000 advance Pat made to Terry in July 2000.  Pat obtained the funds to make the advance by taking a bank loan secured by her home.  The outstanding balance on the $10,000 advance was approximately $5,500 in November 2005.  Terry agreed to pay Pat $200 per month on the outstanding balance until it was paid in full, and Irma also agreed to continue to pay the debt if Terry died before making full payment.  The balance due on the debt was $2,910 when Terry died.  Irma and her son, David, paid off the debt in 2007.  As this second loan had been fully paid well before Irma commenced her bankruptcy case in 2011, it was not part of Pat's claim in Irma's bankruptcy case and is not at issue in this appeal.

and listing the 76 shares of Prudential stock as the property in decedent's estate.[3] Prudential re-issued the shares of stock in the name of "Irma E. Kidd TOD David E. Kidd."[4] Irma sold the Prudential stock in July of 2011 for approximately $4,400. Irma and David each paid half of that amount to the bankruptcy trustee before Pat filed this adversary proceeding.

Later in 2007, a second account at Commerce Bank was opened in the names of Irma, David, and Jennifer, jointly (the "Joint Account"), and the funds remaining in David and Jennifer's Commerce Bank Account were transferred to the Joint Account. In 2009, Irma inherited approximately $83,000 from the estate of Nina Kidd, Terry's step-mother. Irma deposited those funds into the Joint Account. Altogether, the disability and life insurance benefits, plus the inheritance from Nina Kidd, totaled approximately $211,000. All of these transfers of funds occurred more than one year before Irma commenced her bankruptcy case on August 1, 2011.

Both Irma and David testified that they and other members of the Kidd family had understood for a long time that Terry wanted to provide for his family, consisting of Irma, David, and Margo.[5] They testified further that the family members assumed and understood that the disability benefits as well as any money Terry left on his death was "family money." Irma and David testified that family money could be used by any of the three family members if they needed it, but the expectation and their belief was that it "belonged" in thirds to Irma, David, and Margo. Although no written records were kept regarding each

---

[3]     Appellee's App. at 710.

[4]     "TOD" stands for transfer on death.

[5]     Margo is Terry and Irma's daughter. Although David and Irma considered Margo to have a one-third interest in any "family money," Margo's name was not placed on the bank accounts into which such monies were deposited because of issues Irma and David had regarding either Margo or her husband's ability to handle finances responsibly. David provided Margo with money from the accounts from time to time.

-4-

person's use of "family money," Irma and David testified that it was understood by the family members that each had one-third of it to spend.

After Pat commenced an adversary proceeding objecting to Irma's discharge, David prepared an accounting in which he allocated expenditures of "family money" to Irma, Margo, and himself. David's accounting showed that about one-third of the funds had been used for Irma's benefit more than one year before Irma commenced her Chapter 7 bankruptcy case. Pat attacks David's allocation of funds to Irma. For example, Pat attacks David's allocation to Irma of funds used to repay Irma's sister for loans she made to fund Store operations. Pat also claims David misallocated funds to Irma that were used to pay a contractor who performed work on both Irma and David's homes around the same time.

On January 14, 2011, within one year of the Petition Date, David and Jennifer opened a new account at Commerce Bank solely in their names (the "January 2011 Commerce Bank Account"). David then transferred what remained of the funds in the Joint Account (approximately $55,000) to the January 2011 Commerce Bank Account. Both Irma and David testified that David took this action without Irma's knowledge or permission. David also testified that he transferred the funds because they belonged to him and his sister, as Irma had already spent her one-third share, and he was concerned that Pat might attempt to attach the Joint Account in connection with the state court lawsuit she filed against Irma. Irma testified that she did not believe she had any interest in the funds remaining in the Joint Account as of January 14, 2011 because she had already spent her one-third share of the money by that time.

Another January 14, 2011 event involved removal of Irma's name from a savings account at Rose Hill Bank held in the names of Irma, David, and Margo with an account balance of approximately $6,000. Irma testified she had no idea why her name was removed from the account. Irma's name was added back to the

-5-

account the very next day, although the account thereafter had David's social security number associated with it, rather than Irma's.[6]

In her bankruptcy schedules, Irma disclosed only two secured debts, a mortgage debt and a disputed mechanic's lien, both of which were secured by her home. Pat was Irma's only unsecured creditor. On Schedule B, Irma listed a one-half interest in the Prudential stock. She also listed "deposit accounts" totaling $2,232.54, but did not specifically identify any Rose Hill bank accounts. Irma did not disclose in her Statement of Financial Affairs ("SOFA") the removal of her name in January 2011 from the Rose Hill savings account she held with David and Margo. With respect to the Joint Account, Irma disclosed in her SOFA that her name had been removed from the account in January 2011, but that none of the funds in that account belonged to her.

Pat filed an adversary complaint in Irma's bankruptcy case on December 27, 2011, seeking denial of Irma's discharge under 11 U.S.C. § 727(a)(2) and (4).[7] The bankruptcy court conducted a trial on the merits on May 6 and 7, 2014. On November 24, 2014, the bankruptcy court issued a memorandum decision and a judgment denying Pat's objections to Irma's discharge. The bankruptcy court withdrew its memorandum opinion on December 2, 2014, so it could correct minor errors. On the same day, the bankruptcy court entered an amended memorandum opinion "nunc pro tunc to filing date of the original."[7] Pat filed her notice of appeal on December 4, 2014.

---

[6] On March 8, 2011, funds from a Rose Hill checking account were transferred to the Rose Hill savings account. Pat did not complain about that transfer.

[7] Unless otherwise indicated, all further statutory references in this decision will be to the Bankruptcy Code, which is Title 11 of the United States Code.

[7] Appellant's App ("App") at 173-174 (Order Withdrawing Previously Signed Memorandum Opinion and Order Providing That The Memorandum Opinion and Order Signed Contemporaneously with This Order Be Effective Nunc Pro Tunc To The Original Filing Date, Bankr. ECF No. 91 ("Bankruptcy Order")).

## II. Appellate Jurisdiction

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[8] The bankruptcy court judgment fully and finally resolved the claims in an adversary proceeding and is therefore a final judgment for purposes of appeal.[9] Plaintiff timely filed her notice of appeal on December 4, 2014, within fourteen days of entry of the bankruptcy court's judgment, and neither party properly elected to have the district court hear this appeal.[10] Therefore, this Court has valid appellate jurisdiction.

## III. Issues and Standard of Review

    A.    Did the bankruptcy court err in its denial of Pat's § 727(a)(2) fraud claim?

    B.    Did the bankruptcy court err in its denial of Pat's § 727(a)(4) false oath claim?

"'A decision whether to grant or deny a discharge is in the sound discretion of the bankruptcy court,' and a bankruptcy court's denial of discharge is therefore reviewed for abuse of discretion."[11] However, Pat's principal claim in this appeal

---

[8]     28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8005; 10th Cir. BAP L.R. 8001-3.

[9]     *Adelman v. Fourth Nat'l Bank & Tr. Co. (In re Durability, Inc.)*, 893 F.2d 264, 266 (10th Cir.1990) (in bankruptcy, adversary proceeding is a "judicial unit" for purposes of finality).

[10]     Pursuant to Fed. R. Bankr. P. 8002(a), a party seeking to appeal an order must file a notice of appeal from that order within fourteen days of its entry on the docket. In order to have an appeal heard by the district court rather than the BAP, an appellant in this Circuit must file a statement of election that conforms substantially to the official bankruptcy form that, in turn, requires the election to be made in the notice of appeal. *See* 28 U.S.C. § 158(c); 10th Cir. BAP L.R. 8001-3 and 8001-1; Official Bankruptcy Form 17A. As appellant's election was submitted as a separate document, it did not constitute a valid election and her attempt to elect was denied on December 5, 2014.

[11]     *U.S. Tr. v. Garland (In re Garland)*, 417 B.R. 805, 810 (10th Cir. BAP

(continued...)

is that the evidence is insufficient to support the bankruptcy court's findings that led to its conclusion that Irma had no intent to defraud. A bankruptcy court's finding regarding fraudulent intent under § 727(a)(2) and § 727(a)(4) is a factual determination that is reviewed on appeal for clear error.[12] "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made."[13] "'If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'"[14] "This admonition applies equally regardless of whether the [trial] court's factual findings are based on credibility determinations[,] documentary evidence," or inferences from other facts.[15] Thus, a decision reviewed under the clearly erroneous standard is not required to be "correct," only "permissible."[16] To the extent Pat raises legal issues, this Court will review them *de novo*, which requires an independent determination of the

---

[11]   (...continued)
2009) (citing 4 Norton Bankr. L. & Prac. 3d § 86:1 (2009)).

[12]   *Holaday v. Seay (In re Seay)*, 215 B.R. 780, 788 (10th Cir. BAP 1997) ("A bankruptcy court's findings concerning intent are factual and subject to review under a clearly erroneous standard") (citations omitted). *See also Woolman v. Wallace (In re Wallace),* 289 B.R. 428, 433 (Bankr. N.D. Okla. 2003) ("'Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.'") (quoting *Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 251 (4th Cir. 1987)).

[13]   *Mathis v. Huff & Puff Trucking, Inc.,* 787 F.3d 1297, 1305 (10th Cir. 2015) (citation and internal quotation marks omitted).

[14]   *La Resolana Architects, PA v. Reno, Inc.,* 555 F.3d 1171, 1177 (10th Cir. 2009) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, (1985)).

[15]   *Id.*

[16]   *In re BYOC Int'l Inc.,* 233 B.R. 176,  at *2 (10th Cir. BAP 1998).

issues, giving no special weight to the bankruptcy court's decision.[17]

## IV.    Discussion

We are not persuaded by Pat's arguments on appeal. The bankruptcy court's findings in support of its rulings that Pat failed to prove all elements necessary to sustain her claims under § 727(a)(2) and § 727(a)(4) are supported by the record, and we do not have a definite and firm conviction that the bankruptcy court erred with respect to those findings.

### A.    Section 727(a)(2)

Pat's claim under § 727(a)(2) is essentially that Irma transferred ownership and control of the funds she received after the deaths of Terry and Nina Kidd to her son David and his wife, Jennifer, in a fraudulent effort to keep Pat from collecting a legitimate debt.  Pat contends that Irma and David conspired to put Irma's assets beyond Pat's reach by labeling Irma's funds as "family money."  Pat also asserts that Irma's removal of her name from the Rose Hill bank account in January 2011 constituted a fraudulent transfer of Irma's property, supporting the denial of Irma's discharge under § 727(a)(2)(A).

These § 727(a)(2) claims present decidedly factual issues, on which Pat bore the burden of proof by a preponderance of the evidence.[18]  Discharge exceptions are narrowly construed because of bankruptcy's "fresh start" objective for debtors, and any factual doubts are resolved in favor of debtors rather than creditors.[19]

To successfully prove a § 727(a)(2) claim, Pat would have had to establish that Irma: 1) transferred or concealed, 2) her own property, 3) within the one-year

---

[17]    *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991).

[18]    *Wagner v. Wagner (In re Wagner)*, 527 B.R. 416, 430 (10th Cir. BAP 2015) (creditor asserting exception to discharge bears burden of proving the elements of the exception by a preponderance of the evidence).

[19]    *Id.* (due to bankruptcy's "fresh start" objective, exceptions to discharge are narrowly construed, and doubt is resolved in favor of the debtor).

period prior to the Petition Date, 4) "with intent to hinder, delay or defraud" Pat.[20]
The bulk of the property at issue consists of death benefits paid to Irma on Terry's
life insurance, and her inheritance from Nina Kidd.[21] Because some of the
transfers Pat claims are subject to § 727(a)(2) occurred before the one-year period
preceding the Petition Date, Pat also relies on the doctrine of continuous
concealment.

### *Whether the continuous concealment doctrine applies*

The continuous concealment doctrine provides that "a concealment will be
found to exist during the year before bankruptcy even if the initial act of
concealment took place before this one year period as long as the debtor allowed
the property to remain concealed into the critical year."[22] Typically, continuous
concealment claims are made when a debtor transfers ownership of property to
another, but actually retains equitable ownership of it.[23] However, here, for nearly
the entire period after Irma obtained the disputed funds, the unexpended funds
were held in the Joint Account owned by Irma, David, and Jennifer until
transferred to the January 2011 Commerce Bank Account within one year of the

---

[20]     Section 727(a)(2)(A) provides, in its entirety:
(a) The court shall grant the debtor a discharge, unless--
        (2) the debtor, with intent to hinder, delay, or defraud a creditor or an
        officer of the estate charged with custody of property under this title,
        has transferred, removed, destroyed, mutilated, or concealed, or has
        permitted to be transferred, removed, destroyed, mutilated, or
        concealed--
                (A) property of the debtor, within one year before the date of
                the filing of the petition....

[21]     The only property Irma actually "inherited" from Terry consisted of the 76
shares of Prudential stock that she sold for approximately $4,400 in July 2011.
The proceeds from the sale of the Prudential stock were not at issue at trial and
are also not at issue in this appeal.

[22]     *Wieland v. Gordon (In re Gordon),* 509 B.R. 359, 371 (Bankr. N.D. Okla.
2014) (quoting *Rozen v. Bezner,* 966 F.2d 1527 (3d Cir. 1993).

[23]     *See, e.g., U.S. Tr. v. Garland,* 417 B.R. 805, 811-13 (residence and
business entities transferred to family-owned partnerships); *In re Gordon,* 509
B.R. at 373 (residence, vehicles, and stocks titled in debtor's wife's name only).

Petition Date.[24] Thus, Irma did not continuously conceal her interest in the funds until the critical year, as her interest was evident from the Joint Account itself. Even if this Court were to adopt the continuous concealment doctrine, it does not apply here.

### Whether Irma's true ownership of all of the "family money" affects Pat's claim under § 727(a)(2)

Pat attempted to prove at trial, and reargues on appeal, that all of the funds Irma received from Terry's insurance policies and Nina Kidd's estate belonged solely to Irma based on Kansas law of inheritance and joint account ownership. Pat reasons that the bankruptcy court's finding that Irma considered the funds "family money" is wrong because Irma did not own the funds under applicable state law. It was unnecessary, however, for the bankruptcy court to determine ownership of the funds to determine whether Pat sustained her claim under § 727(a)(2). In fact, the bankruptcy court expressly declined to decide who owned the funds.[25]

The bankruptcy court denied Pat's discharge objection alleging that Irma transferred her interest in "family money" with the intent to hinder, delay, or defraud creditors based on its finding that Irma did not transfer any of the funds with fraudulent intent, regardless of who owned the funds or whether David transferred the funds as Irma's agent or with Irma's implied consent. As discussed below, the bankruptcy court did not commit clear error in making that finding. The bankruptcy court, therefore, did not err by failing to determine the

---

[24] Funds traceable to Terry's disability benefits and Terry's life insurance proceeds were transferred to the Joint Account in 2007. Irma deposited the proceeds from Nina Kidd's life insurance directly into the Joint Account in 2009.

[25] The bankruptcy court specifically stated that it made "no ruling on whether the Debtor had an interest in the [jointly owned account] in January 2011 before the transfers [out of that account] were made." Appellant's App at 194 (Memorandum Opinion and Order, Bankr. ECF No. 92 at 20) ("Bankruptcy Op.").

true ownership of the funds or whether Irma authorized or impliedly consented to the transfers.

### Whether the evidence required a finding of fraudulent intent under § 727(a)(2) and the "badges of fraud"

"To deny a discharge under § 727(a)(2), a court must find *actual* intent to defraud creditors."[26]  Courts may infer fraudulent intent from the debtor's conduct, particularly conduct that bears "indicia of fraud."[27]  Gratuitous property transfers, and transfers of property to family members constitute the types of conduct other courts have identified as indicia, or "badges," of fraud.[28]  But bankruptcy courts are not required to identify and consider a specific list of fraud badges in determining intent, as Pat has suggested.  "Whatever badges of fraud a court uses, no particular badge is necessary, nor is any combination sufficient."[29]  Cases involving inferences of fraud "are peculiarly fact specific, and the activity in each situation must be viewed individually."[30]

In this case, in considering the entirety of the evidence before it, the bankruptcy court simply was not convinced that Pat had sustained her burden of

---

[26]    *Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991). *See also Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008).

Pat cites *In re Butler,* 377 B.R. 895 (Bankr.D. Utah 2006) for the proposition that denial of discharge under § 727(a)(2) "'need not rest on a finding of intent to *defraud.*  Intent to hinder or delay is sufficient.'" *Butler,* 377 B.R. at 915 (*quoting Bernard v. Sheaffer (In re Bernard),* 96 F.3d 1279, 1281 (9th Cir. 1996) (emphasis in *Butler*)).  However, the Tenth Circuit standard for denial of discharge under § 727(a)(2) requires actual fraudulent intent. *See Carey,* 938 F.2d at 1077 (denial of discharge under § 727(a)(2) requires "actual intent to defraud").

[27]    *Carey*, 938 F.2d at 1077.

[28]    *Id.*

[29]    5 Collier on Bankruptcy, ¶ 548.04[1][b][ii] at 548-549 (Alan N. Resnick, et al. eds., 16th ed. 2012) (addressing badges of fraud as evidence of fraudulent intent under § 548, which contains similar "hinder, delay, or defraud" language as is found in § 727(a)(2)(A)).

[30]    *Carey,* 938 F.2d at 1077.

proving Irma acted with actual intent to "hinder, delay, or defraud" her. The bankruptcy court found that it had "no doubt that Debtor and David sincerely believed that Debtor has no interest in the remaining 'family funds' in January 2011."[31] This was a "peculiarly fact specific" finding that depended, in large part, on the bankruptcy court's determination of each witness' credibility. A trial court's credibility determinations are subject to great deference on appeal.[32]

Pat considers Irma's explanation of why Irma did not believe she had any interest in the funds as of January 2011 unreasonable and, therefore, unbelievable. However, the actual fraud standard is not an objective standard based on the reasonableness of the debtor's belief. For actual fraud to exist, "[t]he debtor must have acted with the *subjective intent* to deceive the creditor."[33] Subjective intent to defraud may be inferred from a totality of the circumstances, including a debtor's reckless disregard for the truth.[34] However, equating reckless disregard for the truth with subjective intent to defraud is narrowly limited, because "a misrepresentation is fraudulent only if the maker knows or believes the matter is

---

[31]    Appellant's App. at 194. The bankruptcy court made this finding in connection with the claims under § 727(a)(4), but the substance of the finding applies equally to the claims under § 727(a)(2)(A).

[32]    *See Wagner v. Wagner (In re Wagner)*, 527 B.R. 416, 432 (10th Cir. BAP 2015). *See also* Fed. R. Civ. P. 52(a)(6), made applicable to adversary proceedings by Fed. R. Bankr. P. 7052 (appellate court must give due regard to trial court's opportunity to judge witness credibility).

[33]    *DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (10th Cir. BAP 2012)(citations omitted).

[34]    *See Cox v. Villani (In re Villani),* 478 B.R. 51, 61 (1st Cir. BAP 2012) ("extreme carelessness or reckless indifference . . . equates to fraud and a bar to discharge [under § 727(a)(2)(A)] . . .") (citation omitted); *McClain v. Parker (In re Parker),* 531 B.R. 103, 107 (Bankr. E.D.N.C. 2015) (fraudulent "[i]ntent exists [under § 727(a)(2)] if the debtor acted with a reckless disregard for the truth.") (citation omitted). *Cf. U.S. Tr. v. Garland (In re Garland),* 417 B.R. 805, 815 (10th Cir. BAP 2009) ("'reckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A).'") (quoting *Cadle Co. v. King (In re King),* 272 B.R. 281, 302 (Bankr. N.D. Okla. 2002)).

-13-

not what he represents it to be."[35]

Pat reargues her interpretation of Irma and David's conduct as evidence of fraud, attempting to convince us on appeal that the bankruptcy court reached an erroneous conclusion. For example, Pat emphasizes inconsistencies in Irma's testimony regarding why her funds were initially deposited into David and Jennifer's account, and how the "family money" could be used by any of the family members for any purpose if they needed it. Pat also focuses on what she views as improper allocations of disbursements attributable to Irma's share of the "family money" and the "secret" nature of the agreement regarding "family money."

Nevertheless, after judging the credibility of the witnesses and weighing all of the evidence, the bankruptcy court found that Pat failed to prove by a preponderance of the evidence that Irma acted with actual intent to defraud under § 727(a)(2). The bankruptcy court could have reached a different conclusion regarding Irma's state of mind. But it is not for us to redetermine the facts or to re-examine witness credibility. This Court simply determines whether the version of the facts accepted by the bankruptcy court "is plausible in light of the record viewed in its entirety."[36]

We acknowledge that the factual record contains various indicia of fraud, including that the transfers were made to family members, for no consideration, and with knowledge that Irma's obligation to pay Pat's claim had been triggered

_____

[35] *In re Cribbs*, 327 B.R. 668, 673 (10th Cir. BAP 2005), *aff'd*, No. 05-6225, 2006 WL 1875366 (10th Cir. July 7, 2006) (internal quotation marks and citation omitted).

[36] *See La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009) (quoting *Anderson v. Bessemer,* 470 U.S. 564, 565 (1985)).

by Terry's death.[37]  However, "indicia" of fraud are just that–indications that suggest fraud, which can be negated by explanations about what occurred.[38] Although Irma's conduct may raise red flags, it is also consistent with a family agreement to treat such funds as "family money," roughly divisible in thirds, but available to any family member if necessary.  Both Irma and David testified that they considered the funds to be for the benefit of all three family members, and evidence of such a shared perception even preceded Terry's death: Terry allowed his disability funds to be deposited into David and Jennifer's Commerce Bank Account.[39]  Moreover, Irma permitted use of the funds for the benefit of all three family members: herself, David, and Margo.  Finally, Irma testified that she did not consider the funds in the account as of January 14, 2011 to be her funds because she had already spent her one-third share of the "family funds" by that time.  Although the bankruptcy court could have reached a different result based on the evidence, having reviewed the entire record, we do not have a firm and definite conviction that the bankruptcy court made a clear error of judgment or

---

[37]     We see no need to discuss each and every badge of fraud that was proffered by Pat, such as David's "attitude" about her claim or Irma's stated belief that she did not owe Pat the money.  The bankruptcy court considered all of the evidence that was presented at trial and simply reached a different conclusion than does Pat.  We do not doubt that Pat believed, and will continue to believe, that Irma "conspired" with David to keep her assets away from Pat.  But our legal system does not determine the merits of a claim based on which party has the strongest conviction regarding her position.  Trial courts are frequently faced with difficult decisions based on conflicting evidence, which is at least partially why the system imposes a burden of proof on one of the parties.  In this case, Pat bore that burden.

[38]     *See, e.g., Geyer & Assocs. CPA's, P.C. v. Stewart (In re Stewart)*, 421 B.R. 603, *3 (10th Cir. BAP 2009) (badges of fraud are facts that call for explanation and can be negated by specific facts).

[39]     Although it is not clear who actually made this deposit, it could only have been deposited to an account that Terry did not own with Terry's endorsement, and there is no evidence that the deposit was made without Terry's approval.

went beyond the boundaries of permissible choice.[40]

The evidence presented at trial does not compel this Court to conclude that Irma and David were lying about their view of "family money," nor that they recklessly disregarded the funds' true ownership in order to defraud Pat. The bankruptcy court concluded that no actual fraudulent intent was involved, based on its consideration of all of the evidence and its evaluation of witness credibility. Similarly, with respect to the removal of Irma's name from the Rose Hill bank account, the bankruptcy court pointed out that the change only lasted for one day, and that Irma did not dispute that she continued to have an ownership interest in the account.[41]

The bankruptcy court found that each of the witnesses at trial "testified truthfully about his or her recollection of events," despite inconsistencies in their testimony, and the court chose to "adopt[] the version [of events] which form[ed] the most credible and likely scenario consistent with the documentary evidence."[42] In sum, we find the bankruptcy court's decision plausible in light of the entire record and, therefore, reversal on appeal is inappropriate.

---

[40] *See United States v. Rockwell Int'l Corp.,* 124 F.3d 1194, 1201 (10th Cir. 1997) (court of appeals will not disturb the trial court's decision unless it has "a firm and definite conviction[ ] that it made a clear error of judgment or went beyond the boundaries of permissible choice.") (citation omitted).

[41] Appellant's App at 198. The bankruptcy court identified a March 2011 transfer of funds from the Rose Hill checking account to the Rose Hill savings account as the subject of Pat's § 727(a)(2) claim. *See also* Bankruptcy Op. at 22. On appeal, Pat states that she has never claimed that the March 2011 transfer between Rose Hill bank accounts defrauded creditors, and clarified that her § 727(a)(2) claim relating to the Rose Hill account is premised on Irma's removal of her name from the account in January of 2011. *See* Appellant's Br., at 25, n.3. Although the bankruptcy court may have incorrectly identified the subject of Pat's § 727(a)(2) claim, its factual findings with respect to Irma's removal of her name from the Rose Hill account are sufficient to support its conclusion that Irma did not remove her name from the account with actual intent to defraud, a requirement under both § 727(a)(2) and § 727(a)(4).

[42] Appellant's App at 177 (Bankruptcy Op. at 3).

### B. Section 727(a)(4)

Pat's claim under § 727(a)(4)[43] is based upon two statements and one omission[44] in Irma's bankruptcy filings:

1) In ¶11 of the SOFA[45] filed with her petition, Irma represented that her name had been removed from a Commerce Bank savings account in January 2011, and that "[n]one of the funds in the account belonged to [her];"

2) In Schedule B, Irma represented that she owned a "½ interest" in the Prudential stock she had inherited from Terry; and

3) Irma failed to disclose anywhere in her filings that she had two bank accounts at Rose Hill Bank, and that her name had been removed from one of those accounts in January 2011.

To deny a debtor's discharge under § 727(a)(4), a bankruptcy court must be convinced that 1) the debtor acted "knowingly and fraudulently" with respect to the misstatement or omission; and 2) the misstatement or omission "relates to a material fact."[46] Like § 727(a)(2), fraudulent intent under § 727(a)(4) "may be deduced from the facts and circumstances of a case."[47] A statement or omission is "material" under § 727(a)(4) "if it bears a relationship to the [debtor's] business transactions or estate, or concerns the . . . existence and disposition of his

---

[43] Section 727(a)(4) provides, in pertinent part, that "[t]he court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case – made a false oath or account."

[44] The intentional and fraudulent omission of assets from the debtor's sworn Statement of Financial Affairs or schedules can constitute a false oath under § 727(a)(4). *See Calder,* 907 F.2d 953, 955 (10th Cir. 1990)(acknowledging that "an omission of assets from a Statement of Affairs may constitute a false oath under section 727(a)(4)(A).") (citing *Farmers Co-op v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982) (acknowledging that a fraudulent omission can constitute a false oath under the Bankruptcy Act)).

[45] This paragraph asks debtors to identify their financial accounts that were closed or transferred within one year of the petition.

[46] *Garland,* 417 B.R. 805, 814 (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997)).

[47] *Id.,* 417 B.R. at 815 (citing *In re Calder,* 907 F.2d 953, 955-56 (10th Cir. 1990)).

property."[48] This standard of materiality has a low threshold. The reason for this is simple– when an individual debtor accepts the protections afforded by the bankruptcy system, he or she must also accept the responsibility to fully disclose all assets and to cooperate with the bankruptcy trustee. Nonetheless, "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."[49]

Pat first takes issue with Irma's statement in her SOFA that she did not own any of the funds that were removed from the Joint Account the preceding January. This is essentially the same claim Pat made under § 727(a)(2), *i.e.*, that Irma's assertion that her own assets were "family money" was actually a fraud intended to prevent Pat from recovering her loan.[50] As we have already noted, however, the bankruptcy court's finding that Irma sincerely believed she no longer owned the funds (regardless of whether she actually owned them) and, therefore, lacked the requisite fraudulent intent, is not clearly erroneous. The bankruptcy court reiterated that finding with respect to Pat's § 727(a)(4) claim, stating:

> Based upon the testimony as a whole, the Court has no doubt that Debtor and David sincerely believed that Debtor had no interest in the remaining "family funds" in January 2011. There is therefore no basis to find that the errors and omissions regarding the withdrawals from and closure of Commerce account *0086 were knowing and fraudulent.[51]

Absent actual fraudulent intent, Pat's claim under § 727(a)(4) based on Irma's representation in her SOFA that none of the funds in the Joint Account belonged to her fails.

---

[48]     *Id.*, 417 B.R. at 814.

[49]     *In re Brown*, 108 F.3d at 1294.

[50]     This Circuit has recognized that omission of assets from a debtor's bankruptcy filings can be both a concealment and a false oath under Section 14(c) of the Bankruptcy Act. *See Strunk*, 671 F.2d 391, 395.

[51]     Appellant's App. at 200 (Bankruptcy Op. at 26).

Pat next asserts that Irma's disclosure of a one-half interest in the Prudential stock in her schedules is a false oath sufficient to deny Irma's discharge under § 727(a)(4). Pat points to the Small Estates Affidavit Irma signed, identifying all 76 shares of the Prudential stock and stating that Irma was Terry's only heir, as evidence contradicting Irma's subsequently stated belief as to the stock ownership. Although this evidence might have led the bankruptcy court to find that Irma was lying when she signed her Schedules, it did not. We will not reverse the bankruptcy court on this issue because other evidence in the record supports the bankruptcy court's conclusions.

Irma's bankruptcy counsel testified that only half of the stock value was included on Irma's Schedule B based on Irma's understanding that she only owned half, and that David owned the other half. The Small Estates Affidavit was signed more than two years before the filing of Irma's petition, making it plausible that Irma simply did not recall it, even if she had once understood it, when preparing her bankruptcy filings.

We reemphasize that findings the bankruptcy court could have made based on the evidence before it do not require us to conclude on appeal that failure to make those findings was clear error. The bankruptcy court focused on the consistency of Irma's conduct and the expression of her understanding of the stock ownership, including her discussion of the issue with her bankruptcy counsel, and Irma and David's separate payments to the bankruptcy trustee of one-half of the proceeds each from the 2011 sale of the Prudential stock. The bankruptcy court also noted that, if Irma's "intent was to conceal her interest in the stock, she would have made no disclosure, rather than an incomplete disclosure."[52] We

---

[52] *Id.* at 198. We note that the bankruptcy court did not discuss the impact of the Small Estates Affidavit, if any, on this finding. However, a trial court need not discuss every potentially contrary bit of evidence in order for its findings to

(continued...)

cannot conclude from the record that the bankruptcy court clearly erred in finding that Irma's testimony about the stock ownership was credible. And absent fraudulent intent, Irma's disclosure of only a one-half interest in the Prudential stock, though false, was insufficient to deny Irma's discharge under § 727(a)(4).

Finally, Pat contends that Irma fraudulently omitted information from her SOFA and schedules concerning the Rose Hill bank accounts by failing to disclose: 1) the two Rose Hill accounts; and 2) that she removed her name from a Rose Hill account in January 2011. Irma did not identify any Rose Hill accounts in her SOFA or schedules. However, as the bankruptcy court noted, Irma did disclose the total amount of funds in her Rose Hill accounts on her Schedule B, listing them simply as "deposit accounts" totaling $2,232.54. Although this disclosure is incomplete inasmuch as it fails to identify specific bank accounts, it was sufficient to alert the bankruptcy trustee and creditors that Irma's assets included funded deposit accounts. Moreover, there is no suggestion that Irma attempted to conceal these accounts in any way after filing her petition. This "omission" therefore falls well short of proof of actual intent to defraud.

With respect to the removal of Irma's name from a Rose Hill account a few months before the petition date, the bankruptcy court noted that the change lasted only one day, and that the only resulting change was that David's social security number became associated with the account, rather than Irma's. Irma did not deny that the Rose Hill funds were hers, as is evident from her Schedule B.

Based on this evidence, the bankruptcy court concluded that Irma's failure to disclose the one-day change in ownership on the Rose Hill bank account "was

---

[52]    (...continued)
be upheld. *See, e.g., O'Steen v. Buckner (In re Buckner)*, 337 B.R. 728, at *3 (10th Cir. BAP 2005) (bankruptcy court not required to discuss evidence unnecessary to its decision on intent).

not material and cannot be the basis for the denial of her discharge."[53] We do not necessarily agree with the bankruptcy court's conclusion that this omission was "not material," given the low standard of materiality in this context.[54] We do agree, however, that the one-day loss of ownership had absolutely no effect on the inclusion of the funds in the Rose Hill bank accounts in Irma's bankruptcy estate. Pat relies on Irma's lack of explanation for why the change was made as continuing evidence of a pattern of concealment. But there is little evidence in the record to indicate that Irma's omission from her schedules or SOFA of the one-day change in ownership on the Rose Hill bank account was made for the purpose of concealing assets with actual fraudulent intent. To the contrary, the fact that Irma added her name back on the Rose Hill bank account within a day, later included the combined balance of the Rose Hill bank accounts in her bankruptcy schedules, and never denied her ownership of the funds in the Rose Hill bank accounts all support the bankruptcy court's conclusion that she was not attempting to conceal them. We therefore agree with the bankruptcy court's ultimate conclusion that Pat failed to prove her claim under § 727(a)(4) based on this omission.[55]

## V. Conclusion

The bankruptcy court's findings are supported by evidence presented at trial, and are, therefore, not clearly erroneous. The bankruptcy court's interpretation of the discharge exceptions Pat relied upon is consistent with well established authority, and does not constitute an abuse of the bankruptcy court's considerable discretion in such matters.

---

[53] Appellant's App at 201 (*Bankruptcy Op.* at 25).

[54] *In re Garland,* 417 B.R. 805, 814 (false oath is material "if it bears a relationship" to the debtor's estate).

[55] Appellate courts may affirm on any basis that is supported by the record. *Richison v. Ernest Gr., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).